GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
THOMAS H. FELL, ESQ., Nevada Bar No. 3717
E-mail: tfell@gordonsilver.com
JOHN P. WITUCKI, ESQ., Nevada Bar No. 10800
E-Mail: jwitucki@gordonsilve.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Debtor

E-Filed 12-17-10

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

In re:

TWAIN CONDOMINIUMS, LLC,

Debtor.

Case No.: 10-33323-LBR
Chapter 11

Date:   OST Pending
Time:   OST Pending

**EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER PURSUANT TO BANKRUPTCY RULE 4001(b) AND LR 4001(b): (1) PRELIMINARILY DETERMINING EXTENT OF CASH COLLATERAL AND AUTHORIZING INTERIM USE OF CASH COLLATERAL BY DEBTOR; AND (2) SCHEDULING A FINAL HEARING TO DETERMINE EXTENT OF CASH COLLATERAL AND AUTHORIZING USE OF CASH COLLATERAL BY DEBTOR**

Twain Condominiums, LLC, a Nevada limited liability company (the "Debtor"), debtor and debtor-in-possession, by and through its proposed counsel, the law firm of Gordon Silver, hereby submits its motion (the "Motion") requesting that the Court: (1) enter an interim order (the "Interim Order"), a proposed copy of which is attached hereto as <u>Exhibit 1</u>, preliminarily determining the extent of cash collateral as defined by Section[1] 363(a) (the "Cash Collateral") and authorizing the interim use of Cash Collateral to pay costs of administration and to operate the Debtor's business in the ordinary course pending a final hearing (the "Final Hearing"); and

---

[1] Unless otherwise stated, all Chapter and Section references are to title 11 of the U.S. Code (the "Bankruptcy Code"), all Bankruptcy Rule references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and all references to LR are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada (the "Local Rules").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

(2) setting the Final Hearing to determine the extent of Cash Collateral and authorizing the Debtor to use Cash Collateral during the pendency of this Chapter 11 case (the "Chapter 11 Case").

This Motion is made and based on the points and authorities provided herein, the declaration of Roni Amid submitted concurrently herewith in support of the Motion (the "Amid Declaration"), the pleadings, papers and other records contained in the Court's file, judicial notice of which is hereby requested, and any evidence or oral argument presented at the time of the hearing on this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.
### INTRODUCTION

On December 15, 2010 (the "Petition Date"), the Debtor filed its voluntary Chapter 11 petition for relief, thereby commencing this Chapter 11 Case. See Docket No. 1. The Debtor continues operating its business and managing its property as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner, and no official committees have been established.

### II.
### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(1)(A) and (M) and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Sections 361 and 363, Bankruptcy Rule 4001(b), and LR 4001(b) provide the statutory basis for the relief sought herein.

### III.
### SUMMARY OF RELIEF SOUGHT

1. The Debtor entered into a loan transaction with City National Bank ("CNB") in April 2006, which loan was secured by, among other property, the Debtor's real property, all right, title, and interest to its leases and occupancy agreements affecting its real property, and all

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

2

rents, income, receipts, revenues, royalties, issues and profits arising or issuing from or out of the Debtor's leases or other occupancy agreements affecting its real property.

2. As CNB does not have possession or control over the Debtor's cash, cash equivalents, or deposit accounts as such exist on the Petition Date, CNB does not have a perfected security interest in such cash, cash equivalents, or deposit accounts. However, pursuant to Section 552(b)(2) of the Bankruptcy Code, CNB retains its security interest in the Debtor's cash proceeds that are identifiable and traceable directly from the Debtor's rental revenues generated after the Petition Date.

3. To the extent CNB has a valid interest in postpetition Cash Collateral, the Debtor seeks authorization to use such Cash Collateral to pay the ordinary course administrative expenses of the Debtor's estate, including, but not limited to, the costs of operation and maintenance, including, without limitation, wages and related expenses and benefits, utility charges, trade payables, insurance, maintenance capital expenditures, allowed professional fees and expenses, and all other expenses incurred in operating and administering the Debtor's estate during its Chapter 11 Case. Attached as Exhibit "1" to the Amid Declaration is a summary of projected income and expenses for the first four (4) months following the Petition Date (the "Budget").[2] The Debtor proposes that it be permitted a 15% variance for each line item of the "Operating Cash Disbursements" to account for the inherent fluctuations in monthly expenses such as utilities and maintenance repairs. Similarly, in the event that Debtor's "Operating Cash Disbursements" for any month is less than projected, the Debtor requests that it be authorized to carryover and include such positive variance into the following month.

4. Through the Motion, the Debtor requests that it be entitled to use Cash Collateral on an emergency interim basis pending the Final Hearing in accordance with the Budget, which

---

[2] The Budget will be revised and updated for each subsequent four month period throughout the Chapter 11 Case. No later than ten days prior to the end of each four month period, the Debtor will deliver to CNB a proposed budget for the next four month period (each such updated budget, a "Supplemental Budget"). CNB shall have the opportunity to review and approve such Supplemental Budget and, if approved, such Supplemental Budget shall constitute a Budget without further notice, motion, or application to, order of, or hearing before, the Court. To the extent that the Debtor and CNB cannot agree upon a Supplemental Budget, the Debtor shall be entitled to seek Court approval of such Supplemental Budget on order shortening time.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

3

is necessary to avoid immediate and irreparable harm to the Debtor and the bankruptcy estate. Without the authority to use of Cash Collateral, the Debtor will be forced to cease its operations, thereby eliminating its ability to reorganize. See Amid Declaration ¶ 4.

## IV.
## PERTINENT FACTS

A. **Debtor's Operations.**

5. The Debtor is a Nevada limited liability company. The Debtor's is managing member is Roni Amid. See Amid Declaration, ¶ 5.

6. The Debtor owns and operates 192 noncontiguous individual condominium units within a 254 unit condominium complex known as Twain Estates, which complex is located on the northwest corner of South Arville Street and West Twain Avenue ("Twain Estates"). The Debtor's 192 units are scattered throughout the 56 two story garden and townhouse style buildings. The property was originally built as an apartment complex in 1983 but was mapped and recorded as condominium units in October 2005 with the intention to sell as individual units. After the condominium sales halted in September 2008, the remaining 192 unsold units (the "192 Units") were reverted back to apartment rental units. The 192 Units fall into one of eight unit types: 45 are studio units with 485 square feet per unit; 2 studio units are 515 square feet per unit; 62 are one bedroom/one bath units with 719 square feet per unit; 7 are one bedroom/one bath units with 726 square feet per unit; 34 are one bedroom/one and a half bathroom units with 796 square feet per unit; 7 are two bedroom/two bathroom units with 974 square feet per unit; and 35 are two bedroom/two and a half bathroom townhouse units with 1,041 square feet per unit. Along with the 192 Units, the overall complex also has two swimming pools, two spas, and two laundry rooms and is surrounded by concrete block wall on the back sides of the complex and gated fence on the front sides of the complex (collectively, the "Property"). See Amid Declaration, ¶ 6.

B. **Debtor's Loan Obligation.**

7. On April 27, 2006, a Construction Loan Agreement was entered into between the Debtor and CNB in the amount of $20,370,000.00, with a maturity date of November 1, 2007

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

4

(the "Loan"). <u>See</u> Construction Loan Agreement, attached as Exhibit "2" to the Amid Declaration.

8. The Construction Loan Agreement is secured by a Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "Deed of Trust") dated April 27, 2006 which secures, among other property, the Debtor's real property, all right, title, and interest to its leases and occupancy agreements affecting its real property, and all rents, income, receipts, revenues, royalties, issues and profits arising or issuing from or out of the Debtor's lease or other occupancy agreements affecting its real property (collectively, the "Collateral"). <u>See</u> Deed of Trust, attached as Exhibit "3" to the Amid Declaration.

9. The Construction Loan Agreement was for the purpose of purchasing, rehabilitating and converting the Property to condominiums and to make improvements thereto. <u>See</u> Amid Declaration, ¶ 9.

10. On March 25, 2009, the Construction Loan Agreement was revised pursuant to a Loan Revision Agreement, whereby the Loan's principal balance was reduced to $11,404,234.08, and the maturity date was extended to April 1, 2012. <u>See</u> Loan Revision Agreement, attached as Exhibit "4" to the Amid Declaration.

11. Also on March 25, 2009, the Debtor and CNB entered into an Amendment To Construction Loan Agreement (the "Amendment"). <u>See</u> Amendment, attached as Exhibit "5" to the Amid Declaration.

12. Section 8 of the Amendment amended Section 11 of the Construction Loan Agreement to impose a remargin requirement. The Amendment stated that if an appraisal of the Property indicated that the ratio of the outstanding principal balance plus any remaining undisbursed funds to the then fair market value of the Property exceeded ninety (90%) percent ratio or less, then the Debtor was obligated to pay to CNB, upon CNB's demand, as a principal reduction of the Loan, such amount as was necessary to reduce the ratio to ninety (90%) percent or less. <u>See id</u>.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

5

13. On January 8, 2010, CNB issued a notice requiring a remargin of the Loan by no less than $1,774,234.00 (the "Remargin Amount") pursuant to Section 8 of the Amendment (the "Remargin Notice"). See Remargin Notice, attached as Exhibit "6" to the Amid Declaration.

14. The Remargin Notice provides that the Debtor's failure to pay the Remargin Amount within 30 days would result in an event of default permitting CNB to exercise its rights and remedies under the Loan documents. See id.

15. The Debtor thereafter stated to CNB, both orally and in writing, that it objected to the Remargin Amount. See Amid Declaration, ¶ 15.

16. Ignoring such objections, on February 9, 2010, CNB sent a default notice to the Debtor (the "Default Notice"). See Default Notice, attached as Exhibit "7" to the Amid Declaration.

C. **Foreclosure.**

17. Notwithstanding the Default Notice, the Debtor has continued to make all monthly payments required by the Loan Revision Agreement until December 2010. See Amid Declaration, ¶ 17.

18. On November 4, 2010, CNB initiated the process to proceed with foreclosure sale of the Property by issuing a Notice of Trustee's Sale. The Trustee's Sale was initially set to occur on December 1, 2010, and was continued until December 16, 2010. See Notice of Trustee's Sale, attached as Exhibit "8" to the Amid Declaration.

D. **Debtor's Current Financial Condition Warrants The Right To Use Cash Collateral.**

19. The Debtor's revenue is derived primarily from apartment rental income. As set forth in the Budget, for the four (4) month period commencing on the Petition Date and concluding on April 30, 2011, the Debtor has proposed a budget that anticipates a cash balance of no less than $40,300 per month during the budgeted period. Thus, at all times the Budget shows positive cash flow after payment of expenses. See Budget, attached as Exhibit "1" to the Amid Declaration.

E. **Debtor's Use Of Cash Collateral Is Necessary To Preserve The Value Of The Property.**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

20. On the Petition Date, the Debtor had cash and cash equivalents located on the Property as of the Petition Date (the "Cash on Hand") and cash in its various bank accounts as of the Petition Date (the "Deposit Accounts") in the approximate aggregate sum of $10,963. See Amid Declaration, ¶ 20.

21. The Debtor cannot meet its ongoing postpetition obligations unless it has the immediate ability to use Cash on Hand, the Deposit Accounts, and the cash generated or received by the Debtor from and after the Petition Date (the "Postpetition Cash"). In the absence of such use, immediate and irreparable harm will result to the Debtor, its estate, and its creditors, and will render an effective and orderly reorganization of the Debtor's business impossible. See id., ¶ 21.

22. An integral aspect of maintaining the Debtor's business operations is the Debtor's ability to use Cash on Hand, the Deposit Accounts, and Postpetition Cash to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to their employees, vendors, utilities, taxing authorities, and to pay for necessary ordinary course property maintenance and projects. See id., ¶ 22.

## V.
## LEGAL ARGUMENT

A. **Statutory Framework.**

Section 363 provides that a debtor in possession may not use, sell, or lease cash collateral[3] unless: (1) each entity with an interest in such cash collateral consents; *or* (2) the court, after notice and hearing, authorizes the use, sale, or lease of such cash collateral in accordance with the provisions of Section 363. See 11 U.S.C. § 363(c)(2).

Section 363(e) provides, in relevant part, that "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the

---

[3] Section 363(a) defines "cash collateral" as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

7

trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

While the debtor in possession has the burden of proof on the issue of adequate protection, the entity claiming an interest in the alleged cash collateral has the burden of proof on the issue of validity, priority, and/or extent of its interest in the property. See 11 U.S.C. § 363(p).

Pursuant to Section 363(a), cash collateral includes cash, cash equivalents, deposit accounts, rents, and proceeds "in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a). Whether an entity has a security interest in a particular item of property is generally determined by state law. See Butner v. United States, 440 U.S. 48, 57 (1979); Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 20 (2000).

The "interest" set forth in Section 363(a) refers to a valid and perfected security interest between the parties that secures the cash collateral.[4] A creditor holding a perfected security interest in property "will be entitled to the protection of the cash collateral provisions of [Section] 363(a)" because such interests are not avoidable under the "strong arm" provisions of Section 544(a)(1) and (3). In re Fairview-Takoma Ltd. P'ship, 206 B.R. 792, 799 (Bankr. D. Md. 1997); see also Indian Motorcycle Assocs. III L.P. v. Massachusetts Housing Fin. Agency, 66 F.3d 1246, 1252 (1st Cir. 1995).

**B.  CNB's Perfected Interests In Cash Collateral Is Limited And Any Property Deemed Cash Collateral Should Be Authorized For The Debtors' Use.**

To the extent that Debtor is authorized to use the Cash Collateral, commencing on the Petition Date and each day thereafter, as set forth in the Budget, the Debtor will generate postpetition revenue from apartment rentals (the "Postpetition Revenues").

As previously set forth herein, the Deed of Trust granted CNB "an absolute assignment of all rents, income, receipts, revenues, royalties, issues and profits and other benefits" arising

---

[4] See In re Corner Pockets of the Southwest, Inc., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (stating that only perfected security interests give rise to "cash collateral" as defined by Section 363) (citing Waldron v. Northwest Acceptance Corp. (In re Johnson), 62 B.R. 24, 28-29 (B.A.P. 9th Cir. 1986)); In re Fairview-Takoma Ltd. P'ship, 206 B.R. 792, 796-800 (Bankr. D. Md. 1997).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

8

from or out of the lease of the Collateral. See Exhibit "3" attached to the Amid Declaration. Despite the "absolute assignment" language, under Nevada law, such provision solely provides CNB with a security interest in the Postpetition Revenues.

In 2005, the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Assignment of Rents (the "UARA"), which Nevada then adopted as Chapter 107A of the Nevada Revised Statutes in 2007. The UARA unwound the web of ad hoc solutions surrounding assignment of rents by providing that an assignment of rents is fully perfected at recordation, regardless of other state statute requiring an act subsequent to default to perfect,[5] and that an assignment of rents is a security interest whether or not it is labeled "absolute." See N.R.S. 107A 230. NRS 107A.230 provides that:

> an assignment of rents creates a presently effective security agreement, regardless of whether the document is in the form of an absolute assignment, an absolute assignment conditioned on default, an assignment as additional security or any other form. The security interest in rents is separate and distinct from any security interest held by the assignee in the real property.

Further, an "assignment of rents" is defined as "a transfer of an interest in rents in connection with an obligation secured by real property located in this State and from which the rents arise." N.R.S. 107A.040. While the owner of real property can perform a "true sale" of that property's rents as part of an independent transaction, the act construes any transfer of rents in conjunction with a secured loan as a security assignment. See UARA § 4 cmt. 3.

The UARA in Nevada applies to all assignments of rents, including those signed before the October 1, 2007 enacting date, unless a competing security interest was enforceable, perfected, and its priority already established.[6] As a result, an "absolute" assignment of rents that was made at any time under Nevada law is now definitively considered a mere security interest. As such, the absolute assignment of rents, issues, and profits as provided for in the Deed of Trust is to be treated solely as a security interest; it does not provide the enhanced rights that an absolute assignment would have compelled.

---

[5] N.R.S. 107A.240.

[6] S.B. 168 § 39, 74th Leg., Reg. Sess. (2007); Minutes of the Meeting of the Assembly Committee on Judiciary, 74th Leg. 11 (2007); see also UARA § 19.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

9

1. **Debtor's Cash On Hand And Deposit Accounts Existing On The Petition Date Do Not Constitute Cash Collateral.**

Pursuant to Nevada law, a security interest in cash, cash equivalents, or a deposit account may solely be perfected by possession or control.[7] On the Petition Date, substantially all of the Debtor's Cash on Hand and Deposit Accounts were neither in the possession of nor under the control of CNB. See Amid Declaration ¶ 23. Thus, substantially all of the Debtor's Cash on Hand and Deposit Accounts existing on the Petition Date are not subject to a valid and perfected security interest and do not constitute cash collateral.

C. **The Equities Of The Case Allow For The Debtor's Use Cash Collateral.**

Sections 552(b)(1) and (2) of the Bankruptcy Code provide that prepetition security interests, in certain circumstances, may extend to revenues generated post-petition by the collateral, but allows the Court "based on the equities of the case" to order otherwise. 11 U.S.C. § 552(b)(1) and (2). As aptly explained by the United States Bankruptcy Court for the Southern District of New York:

> Even if there is a valid security interest in post-petition acquired property constituting the proceeds, products, offspring, or profits of pre-petition collateral, § 552(b)(1) still allows a court to trump a pre-petition lien to this post-petition acquired property after notice and a hearing and based on the equities of the case. Depending on equities of the case, profit or loss of the property may be given to the estate or to the secured party, or apportioned between them. The equities of the case doctrine is intended to ensure that secured creditors do not receive a windfall benefit when a trustee uses assets of the estate, for example, to finish uncompleted inventory, and it is also used to adjust recovery by a secured creditor in situations where there is an improvement or decline in the post-petition collateral, especially in situations where the change in value is brought about by a party in the bankruptcy.

In re Barbara K. Enterprises, Inc., 2008 WL 2439649 *11 (Bankr. S.D.N.Y. 2008):

Furthermore, the case law and the legislative history accompanying Section 552(b) similarly demonstrate that this equitable exception applies where an expenditure of estate funds

---

[7] See NRS 104.9312(2) (providing in pertinent part that: "(a) a security interest in a deposit account may be perfected only by control under NRS 104.9314;.... (c) a security interest in money may be perfected only by the secured party's taking possession under NRS 104.9313"); see also Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.), 339 B.R. 730, 740 (B.A.P. 9th Cir. 2006); see also NRS 104.9313(1) (providing in relevant part that "a secured party may perfect a security interest in negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral.").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

10

increases the value of the collateral subject to the security interest in question, rather than depletes it. See H. Rep. No. 595, 95th Cong., 1st Sess. 376-77 (1977); see also J. Catton Farms, Inc. v. First Nat. Bank of Chicago, 779 F.2d 1242, 1246 (7th Cir. 1985); Wolters Village, Ltd. v. Village Props., Ltd. (In re Village Props., Ltd.), 723 F.2d 441, 444 (5th Cir. 1984). Indeed, "[w]hen the secured creditor has undertaken affirmative action to protect its right to post-bankruptcy rents, . . . the courts have tended to limit the use to which the rents might be put. For the most part, the debtor in possession or trustee is permitted to use the rents for purposes of maintaining the property, for making real estate tax payments and, if there is a surplus, to make mortgage amortization payments. *These holdings comport with the requirement of adequate protection.*" Saline State Bank v. Mahloch, 834 F.2d 690, 693 n.7 (8th Cir. 1987) (emphasis added); see also Hartsgan v. Pine Lake Village Apt. Co. (In re Pine Lake Village Apt. Co.), 16 B.R. 750 (Bankr. S.D.N.Y. 1982) (holding that despite the absence of a creditor's consent to the debtor's use of postpetition cash collateral, the debtor was authorized to use cash collateral to maintain its apartment property, and that this would ensure that the creditor was adequately protected); In re Carbone Companies, Inc., 395 B.R. 631, 636-637 (Bankr. N.D. Ohio 2008) (authorizing the use of cash collateral and finding that lender was adequately protected where debtor expected to operate at a profit and to generate positive cash flows); In re Franklin Pembroke Venture II, 105 B.R. 276, 278 (Bankr. E.D. Pa. 1989); McCombs Properties VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Props. VI, Ltd.), 88 B.R. 261 (Bankr. C.D. Cal. 1988) (authorizing the debtor's use of cash collateral to improve a building as the proposed renovation was likely to maintain or even increase the value of the secured creditor's collateral, thereby adequately protecting the lender); In re Gunnison Center Apartments, LP, 320 B.R. 391, 397-399 (Bankr. D. Colo. 2005) (finding that a secured creditor was adequately protected where the cash collateral was utilized to "operate the property in good fashion, pay the expenses of operation and the costs of maintenance to preserve and protect the property, and account for the monies received and the expenses paid").

As exemplified by the Budget, the Debtor is likewise solely seeking to utilize the Cash Collateral to maintain the Property in optimal condition and to maximize its occupancy. See

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

11

Exhibit "1" attached to the Amid Declaration. Each expense included within the Budget is a necessary expense to maintain, preserve, and/or operate the Property, which is the sole means of generating revenue, thereby increasing the value of the Property and providing the resources for the Debtor to reorganize. See Amid Declaration ¶ 24. In fact, over the four (4) month period covered by the Budget, the Debtor anticipates increasing its cash balance from less than $11,000 on the Petition Date to in excess of $190,000 by April 30, 2011. See Exhibit "1" attached to the Amid Declaration. As such, the Debtor should similarly be granted authority by this Court to use Cash Collateral as such use will enhance, not diminish, the value of the estate and the Collateral.

D.  **Application Of Cash Collateral And Adequate Protection.**

The Debtor believes that the value of the Collateral is more than the amounts due and owing to CNB under the Loan Revision Agreement as of the Petition Date. See Amid Declaration ¶ 25.

An oversecured creditor is adequately protected if an equity cushion exists which will permit the creditor to recognize payment of its accruing interest. See Pistole v. Mellor (In re Mellor), 734 F.2d 1396, 1401 (9th Cir. 1984) (holding that an 20% equity cushion was adequate protection for the secured creditor) (citing In re McGowan, 6 B.R. 241, 243 (E.D. Pa. 1980) (holding that a 10% cushion is sufficient to be adequate protection), In re Rogers Development Corp., 2 B.R. 679, 685 (E.D. Va. 1980) (holding that a 15% to 20% equity cushion was sufficient adequate protection to the creditor)); In re Berry Good, LLC, 2008 WL 5191741 *1 (Bankr. D. Ariz. 2008) (holding that where the lender is oversecured, "it need not be paid any type of 'adequate protection' under § 361, because it is protected by an equity cushion").

However, assuming *arguendo* that CNB is an undersecured creditor, its Collateral is not depreciating in value. This is evidenced by the fact that as of the Petition Date, the Debtor's revenues exceeded its operating expenses before debt service and are projected to do so on a postpetition basis. Additionally, for the four (4) month period commencing on the Petition Date and concluding on April 30, 2011, the Debtor has proposed a Budget that anticipates increasing the Debtor's cash balance from less than $11,000 to in excess of $190,000 while paying all operating expenses on a current basis. Thus, CNB is not entitled to adequate protection

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

12

payments. See 11 U.S.C. § 506(a)(1); see also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 368-369 (1988). As such, the use of Cash Collateral in accordance with the Budget is appropriate.

In Timbers, the Supreme Court held that an undersecured creditor whose collateral is not depreciating in value is not entitled adequate protection payments due to its lost right to take immediate possession of the collateral, or its "lost opportunity costs." Id. at 369-76. Therefore, unless cash collateral payments received by the secured creditor during the course of the bankruptcy are subtracted from the value of the lender's secured claim, they would constitute adequate protection payments in favor of an undersecured claim, which payments are in contravention of Timbers. See, e.g., Confederation Life Ins. Co. v. Beau Rivage Ltd., 126 B.R. 632 (N.D. Ga. 1991); In re 354 East 66th Street Realty Corp., 177 B.R. 776, 781 (Bankr. E.D.N.Y. 1995); In re IPC Atlanta L.P., 142 B.R. 547 (Bankr. N.D. Ga.1992); In re Oaks Partners, Ltd., 135 B.R. 440 (Bankr. N.D. Ga. 1991); and In re Reddington/Sunarrow L.P., 119 B.R. 809 (Bankr. D.N.M. 1990). Thus, any cash collateral surrendered to a secured creditor postpetition, must be subtracted from the secured portion of the creditor's claim as measured by the value of the collateral as of the petition date. See id.

In this case, assuming CNB is not oversecured, rather than make postpetition "adequate protection" payments to CNB, the Debtor requests authority from this Court to use its revenues to pay its expenses related to the operations and maintenance of the Property, as well as capital expenditures for property improvements and renovations, and in furtherance of expeditiously emerging from bankruptcy. Again, such authority is routinely granted by courts that are faced with similar debtors and circumstances as the ones presented herein. See, e.g., Saline State Bank v. Mahloch, 834 F.2d at 693; In re Gunnison Center Apts., LP, 320 B.R. at 397-399; In re Franklin Pembroke Venture II, 105 B.R. at 278; In re McCombs Props. VI, Ltd., 88 B.R. 261; In re Pine Lake Village Apt. Co., 16 B.R. 750.

The Cash Collateral that the Debtor seeks to use pursuant to the Budget toward its business operations and for maintaining the Property effectively serve as adequate protection payments because they are expended to maintain and improve the Collateral and counteract the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

13

effect of depreciation. See id. This, in turn, improves CNB's position in terms of its Collateral and maximizes the Debtor's ability to reorganize and repay its debt obligations. See In re 354 East, 177 B.R. at 782; In re Reddington/Sunarrow L.P., 119 B.R. at 813.

Consistent with the foregoing wealth of authority, the Debtor respectfully request this Court to authorize it to use the Cash Collateral to maintain and improve the Property in accordance with the Budget, including the proposed variances. The Debtor further requests the use of the Cash Collateral, to the extent needed, to cover the allowed administration costs of its reorganization in its Chapter 11 Case, and for such other expenses necessary to preserve the value of its bankruptcy estates for its creditors.

E.   **The Bankruptcy Code's Policy Of Favoring Reorganization Calls For Granting The Motion.**

A bankruptcy court, where possible, should resolve issues presented in favor of reorganization. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984) ("[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); United States v. Whiting Pools, Inc., 462 U.S. 198, 203 (1983) ("By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors claims, and to produce a return for its owner .

The U.S. Court of Appeals for the Tenth Circuit summarized this principle as follows:

> Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor . . . are of concern to the court, the interests of all the creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.
>
> The first effort of the court must be to insure that the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not to be the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in a formative period prior to the proposal of a reorganization, the court must be flexible in approving the adequate protection standard.

In re O'Connor, 808 F.2d 1393, 1397 (10th Cir. 1987).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102702-001/1089275_2

14

As such, granting the Debtor's request to use Cash Collateral is in keeping with the Bankruptcy Code's general policy favoring reorganizations, particularly as such relief will not result in the diminution of CNB's Collateral.

## VI.
## CONCLUSION

WHEREFORE, the Debtor requests that this Court grant this Motion in its entirety and (1) issue an order pursuant to Bankruptcy Rule 4001(b) and LR 4001(b) preliminarily determining the extent of Cash Collateral, as defined by Section 363(a) of the Bankruptcy Code, as set forth herein, and (2) authorizing the interim use of Cash Collateral to pay costs of administration and operate Debtor's business in the ordinary course pending a Final Hearing, and (3) set the Final Hearing pursuant to determine the extent of Cash Collateral and authorize the Debtor to use Cash Collateral during the pendency of this Chapter 11 Case to pay all costs of administration, and for such other and further relief as this Court deems just and proper.

DATED this 17 day of December, 2010.

GORDON SILVER

By: _____
GERALD M. GORDON, ESQ.
THOMAS H. FELL, ESQ.
JOHN P. WITUCKI, ESQ.
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
[Proposed] Attorneys for Debtor

102702-001/1089275_2