# EXHIBIT 2

## CONSTRUCTION LOAN AGREEMENT
### (Income Property)

This Construction Loan Agreement ("Agreement") is made and entered into as of this 27th day of April, 2006, by and between **Twain Condominiums, LLC, a Nevada limited liability company** ("Borrower"), and **City National Bank**, a national banking association ("Lender").

1.    **RECITALS**.

This Agreement is made with reference to the following facts:

1.1    Borrower has applied to Lender for a loan (the "Loan") of not more than Twenty Million Three Hundred Seventy Thousand Dollars ($20,370,000) (the "Loan Amount"), to be advanced as hereinafter provided, and to be evidenced by a Note Secured by Deed of Trust (the "Note") of even date herewith, payable to the order of Lender in an original principal amount of $20,370,000, with a maturity date of November 1, 2007 (the "Maturity Date").

1.2    The Note is to be secured by, among other things, a Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "Deed of Trust"), covering certain real and personal property (the "Property") located in Clark County, Nevada, as more particularly described in Exhibit "A" attached hereto and made a part hereof, and such other collateral as may be required by Lender, as provided herein.

1.3    Borrower proposes to purchase, rehabilitate and convert to condominiums, 25 two story garden style buildings consisting of 254 condominium units (the "Units") and other improvements (the "Improvements") on certain land that is part of the Property. Borrower will also use the Loan to pay other costs and expenses related to the costs of improving the Units and other portions of the Property. The Improvements will be constructed by a licensed contractor to be determined (the "Contractor") under an agreement with Borrower to be entered into (the "Construction Contract"). The Property and the Improvements are sometimes hereinafter collectively referred to as the "Project."

1.4    Borrower desires to borrow the Loan Amount from Lender, the proceeds of which are to be used by Borrower to finance the costs and expenses of acquiring the Project and constructing the Improvements and costs and expenses incidental thereto and incidental to the Loan, and Lender desires to lend the Loan Amount to Borrower upon the terms and conditions hereinafter set forth. This Agreement, the Note, the Deed of Trust and all other documents and instruments evidencing, securing or pertaining to the Loan are hereinafter collectively referred to as the "Loan Documents."

1.5    Borrower and Guarantor (as defined below) are also executing an unsecured Environmental Indemnity Agreement ("Indemnity Agreement") in connection with the Loan. In the Indemnity Agreement, Borrower and Guarantor agree to indemnify Lender and certain other Indemnified Parties (as defined therein) against liability arising from certain environmental, construction and other risks which may result from Lender's making the Loan to Borrower.

1

Notwithstanding any provision of any Loan Document, Borrower's obligations under the Indemnity Agreement are not and shall not be secured by the Deed of Trust.

1.6    Roni Amid ("Guarantor") has agreed to guaranty Borrower's obligations to Lender, each in accordance with a Continuing Guaranty and Completion Guaranty and Agreement.

**NOW, THEREFORE,** in consideration of the foregoing, the mutual promises and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## 2.    THE LOAN.

On the basis of the covenants, agreements and representations of Borrower contained herein, and subject to the terms and conditions hereinafter set forth, Lender agrees to lend to Borrower, and Borrower agrees to borrow from Lender, a sum not to exceed the Loan Amount, the proceeds of which are to be disbursed by Lender exclusively for the payment of the following costs and expenses (collectively, the "Project Costs"), approved by Lender, in such amounts as are approved by Lender, as hereinafter provided: (i) costs and expenses incurred in connection with the acquisition of the Project; (ii) costs and expenses incurred in connection with the construction and maintenance of the Improvements; (iii) interest and other sums that may accrue or be payable under the Loan Documents, which interest, to the extent paid from Loan proceeds, shall bear interest at the rate provided under the Note; (iv) other costs and expenses incidental to the Project; and (v) costs and expenses incurred in connection with the Loan and Borrower's undertakings hereunder, which proceeds shall be disbursed in accordance with the provisions of Paragraph 3 hereof.

## 3.    DISBURSEMENTS OF THE LOAN.

3.1    **Recordation Disbursements.** Upon recordation of the Deed of Trust and closing of the Loan, and provided that the Title Insurer (as hereinafter defined) has issued or irrevocably committed in writing to issue to Lender, the Title Policy referred to in Paragraph 4.1 hereof, and so long as no Event of Default (as hereinafter defined) or circumstance which with notice or time or both could constitute an Event of Default, has occurred and is continuing, Lender shall disburse (if approved in writing by Lender) to Borrower, or to the persons, firms or corporations entitled thereto, the amounts (each, a "Disbursement") necessary to pay all or portions of: (i) costs, charges and expenses incurred by (a) Lender and payable by Borrower hereunder, or (b) Borrower in connection with title charges and premiums, tax and lien service charges, recording fees, escrow fees, real property taxes and assessments, insurance premiums, loan brokerage commissions, and loan fees payable in connection with the Loan; (ii) the amount, if any, necessary to complete the purchase of the Property; and (iii) other Project costs and expenses theretofore incurred by Borrower, all in accordance with the applicable provisions of the disbursement schedule (the "Disbursement Schedule") attached as Exhibit "B" hereto and made a part hereof.

LoanAgrInc (REV 02/04/99)
109786.2

3.2    **Course-of-Construction Disbursements**.

3.2.1    Subsequent to recordation of the Deed of Trust, and subject to the provisions of this Agreement, including without limitation the provisions contained in Paragraphs 2 and 4 hereof, and so long as no Event of Default (as hereinafter defined) or circumstance which with notice or time or both could constitute an Event of Default has occurred and is continuing, until such time as ninety percent (90%) of the Hard Costs and one hundred percent (100%) of the Soft Costs (as defined in the Disbursement Schedule) has been disbursed, Lender shall disburse directly to Borrower, or, at Lender's option, directly to the Contractor, or to Lender itself, or to such persons as have actually supplied labor, materials or services in connection with, or incidental to, the construction of the Improvements, such sums as are required to be used, and which shall be used only for the payment of (i) the costs and expenses of any of Borrower's undertakings in this Agreement, or any of the other Loan Documents, (ii) interest on borrowings under the Note, (iii) the costs and expenses of Lender which are payable by Borrower, or reimbursable by Borrower as set forth herein, (iv) the costs and expenses of the labor and materials used in constructing the Improvements, and (v) the costs and expenses incidental to the Loan, the construction of the Improvements, Borrower's undertakings in this Agreement or any of the other Loan Documents, or any other matters or things contemplated hereby, all of such costs and expenses being described in Borrower's Cost Breakdown (the "Cost Breakdown") attached as Exhibit "C" hereto and made a part hereof. A ten percent (10%) retention will be withheld from the final Disbursement in accordance with the applicable provisions of the Disbursement Schedule.

3.2.2    The Cost Breakdown restricts Disbursements to line items in cost categories. Borrower agrees that the amounts of a cost category of Disbursements will not exceed the amount stated in the Cost Breakdown. Borrower agrees to use Disbursements solely in conformity with the Cost Breakdown. If the Improvements cannot be completed in strict conformity with the most recently approved Cost Breakdown, Borrower shall immediately submit to Lender for its approval a revised Cost Breakdown, which shall identify Borrower's requested changes in any line items and shall be accompanied by Borrower's written statement of reasons for the changes. Borrower shall execute such documentation and pay for such endorsements to the Title Policy as Lender may reasonably require in connection with the revised Cost Breakdown. If further changes are required, Borrower shall seek Lender's approval, following the procedures described above. Lender need make no further Disbursements unless and until it approves the revised Cost Breakdown, which approval shall not be unreasonably withheld, delayed or conditioned. Lender reserves the right to approve or disapprove any Cost Breakdown in its reasonable judgment. The most recently approved Cost Breakdown shall supersede all previously approved Cost Breakdowns.

3.2.3    Any controversy or claim between or among the parties arising out of or relating to this Paragraph shall at the request of any party be determined by arbitration. The arbitration shall be conducted in accordance with the Commercial Rules of the American Arbitration Association ("AAA"). The arbitrator(s) shall give effect to statutes of limitation in determining any claim. Any controversy concerning whether an issue is arbitrable shall be determined by, and judgment upon the arbitration award may be entered in, any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a

3

provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief, in accordance with Nevada Revised Chapter 38.

3.3     **Final Disbursement**. Subject to the provisions of this Agreement, and so long as no Event of Default or circumstance which with notice or time or both could constitute an Event of Default has occurred and is continuing, the final Disbursement of Loan proceeds constituting the retention portion thereof, shall be made when Borrower has delivered, or caused to be delivered to Lender, in addition to those things required under Paragraph 3 hereof:  (i) such additional title policy endorsements or such additional policies of title insurance with endorsements thereto as Lender may require, with a liability limit of not less than the Loan Amount, issued by the Title Insurer (as hereinafter defined), with coverage, and in form satisfactory to Lender, insuring Lender's interest under the Deed of Trust as a valid first priority lien on the Project, excepting only such items as shall have been approved in writing by Lender, and providing affirmative insurance therein against mechanics' liens, materialmen's liens, or claims or liens in the nature thereof on account of any construction of the Improvements, (ii) one or more certificate(s) of occupancy acceptable to Lender covering all of the Improvements, (iii) if required by Lender, the Architect's written certification that the Improvements have been completed substantially in accordance with the Plans, that all utility connections for the Improvements have been completed, and that the Improvements are otherwise fully operational, and are fully ready for occupancy and use, and (iv) an "as-built" ALTA survey of the Project, showing the location of the completed Improvements, the location of all points of access to the Project, and the Improvements and the location of all easements affecting the Project, and certifying that there are no encroachments of the Improvements onto any easements affecting the Project or onto any adjoining property, and that all applicable setback requirements and other restrictions have been complied with and (v) evidence that all liability that Lender may have in connection with Set Aside Letters (as defined below) issued in connection with the Loan has terminated.

3.4     **Request for Disbursement**. Concurrently with the request for any Disbursement, Borrower shall furnish to Lender, separately with respect to each Disbursement request, a request for advance in the form approved by Lender, duly signed and sworn to, with all appropriate supporting documents attached thereto setting forth such details concerning construction of the Improvements as Lender shall require, including (i) a detailed breakdown of the applicable percentages of completion and costs of the various phases of construction of the Improvements, showing the amounts expended to date for such construction, and the amounts then due and unpaid, an itemized estimate of the amount necessary to complete construction of the Improvements in their entirety, and a certification (the "Certificate") by Borrower and Lender's Inspector (as defined in Paragraph 2.5 hereof) that construction of the Improvements to the date of such Certificate complies with the Plans; (ii) a list of the names and addresses of all materials dealers, laborers and subcontractors with whom written agreements have been made by Borrower or Contractor; and (iii) receipted invoices or bills of sale and conditional and unconditional partial releases of lien (on forms approved by Lender) from each materials dealer, laborer and subcontractor who has done work or furnished materials for construction of the portion of the Improvements covered by each such request for disbursement.

LoanAgrInc (REV 02/04/99)
109786.2

3.5    **Lender's Inspector**.    Throughout the course of construction of the Improvements, Lender shall have the right to employ, at Borrower's sole cost and expense, an inspector or inspectors (collectively, "Lender's Inspector") who shall review, as agent for Lender, all construction activities undertaken in regard to the Project, which Lender's Inspector shall certify or otherwise indicate to Lender that construction of the Improvements and the percentage of completion of the Improvements to the date of each request for disbursement and Certificate are as set forth in the request for disbursement and Certificate submitted by Borrower, that such construction complies with the Plans, and that the progress of construction is such that the construction of the Improvements will be completed on or before October 1, 2007, but in no event later than thirty (30) days prior to the Maturity Date (the "Completion Date"), with each such Certificate and indication from Lender's Inspector to be a further condition precedent to Lender's approval of Borrower's then submitted request for disbursement.

3.6    **Loan in Balance; Borrower's Funds Account**.

      3.6.1    Lender shall be obligated to disburse proceeds of the Loan only when the Loan is "in balance." The Loan is "in balance" whenever the amount of the undisbursed Loan funds, plus any sums provided or to be provided by Borrower ("Borrower's Funds") as shown in the Cost Breakdown most recently approved by Lender, are sufficient in the reasonable judgment of Lender to pay, through completion of the Improvements and maturity of the Loan, all of the following sums:  (i) all costs of construction, marketing, ownership, maintenance and sale of the Improvements; and (ii) all interest and all other sums which may accrue or be payable under the Loan Documents.  Unless otherwise shown in the Cost Breakdown, Borrower's Funds are, or shall be upon request of Lender as provided below, on deposit in a non-interest-bearing account being maintained at Lender in the name of Borrower (the "Borrower's Funds Account").  The Loan is "out of balance" if and when Lender in its reasonable judgment determines that there are insufficient funds (including all undisbursed Loan funds and any sums on deposit in the Borrower's Funds Account) to pay for all such costs and sums payable under the Loan Documents.

      3.6.2    Borrower acknowledges that the Loan may become "out of balance" in numerous ways, not all of which may now be foreseen.  Borrower further acknowledges that the Loan may become "out of balance" from a shortage of funds in any single line item or category of the Cost Breakdown, even if there are undisbursed Loan funds in other line items or categories. Undisbursed Loan funds in one category or line item (e.g., construction costs) may not be applied to another category or line item (e.g., interest reserve) unless either the Cost Breakdown allows such use (and only to the extent specifically allowed) or Lender consents in writing to such use in each instance.  In the event that Lender so consents, such undisbursed Loan funds shall be transferred to a contingency line item before being transferred to another category or line item.  Whenever the Loan becomes "out of balance," Lender may make written demand on Borrower to deposit Borrower's Funds into the Borrower's Funds Account in an amount sufficient in Lender's reasonable judgment to cause the Loan to be "in balance." Borrower shall either (i) immediately deposit with Lender, in cash or cash equivalents, the amount that Lender, in its reasonable judgment, deems necessary to put the Loan "in balance," or (ii) furnish Lender with paid invoices, bills and receipts indicating that Borrower has paid, from Borrower's Funds, for the Project Costs in a sufficient amount to put the Loan "in balance."

5

Borrower hereby irrevocably authorizes and empowers Lender to use and/or dispose of the whole of such deposited money (and any further or additional sums hereafter deposited with lender for like purposes), and Borrower and Lender hereby agree that the same shall be used and/or disposed of, in the manner and for the purposes described in the Loan Documents, the Borrower hereby irrevocably assigning, transferring and pledging to Lender such money for such purposes.  Any failure or refusal by Borrower to comply with the provisions of this Paragraph 2.6.2 shall be deemed a material default hereunder.

3.6.3    At any time, Lender may evaluate the sufficiency of undisbursed Loan funds allocated for payment of future interest ("Interest Reserve"), exercising its reasonable judgment in light of any of: (i) Lender's projections of interest rates for period(s) up to and including the full remaining term of the Loan (and permitted extensions, if any), (ii) cost overruns or change orders, and (iii) failure of the Improvements to lease at the rate of absorption or net effective rental projected by borrower in the Pro Forma Schedule (as defined in Section 19.1 below).  Based on Lender's evaluation of these data and projections, the Loan may be "out of balance."  If this happens, Lender may exercise its rights under Paragraph 2.6.2 or, if it so chooses, Lender may make written demand on Borrower to pay all future interest out of Borrower's Funds until the Interest Reserve is sufficient in Lender's reasonable judgment to cover any and all such amounts that might become due during the remaining term of the Loan.

3.6.4    At any time, Lender may evaluate the sufficiency of undisbursed Loan funds allocated for contingency line items, exercising its reasonable judgment in light of any of: (i) Lender's projections of development and construction costs applicable to the Project for period(s) up to and including the full remaining term of the Loan (and permitted extensions, if any), (ii) cost overruns or change orders, and (iii) failure of the Improvements to lease at the rate of absorption or net effective rental projected by Borrower in the Pro Forma Schedule provided by Borrower and approved by Lender.  Based on Lender's evaluation of these data and projections, the Loan may be "out of balance."  If this happens, Lender may exercise its rights under Paragraph 2.6.2 or, if it so chooses, Lender may make written demand on Borrower to pay all future interest out of Borrower's Funds until the Interest Reserve is sufficient in Lender's reasonable judgment to cover any and all such amounts that might become due during the remaining term of the Loan.

3.7    **Limitations on Disbursements**.  The proceeds of the Loan disbursed under this Agreement shall be evidenced by the Note, and shall be secured by the Deed of Trust, and all such proceeds shall be disbursed, as aforesaid, to Borrower or, at Lender's option, directly to Contractor or to Lender itself, or to such persons as have actually supplied labor, materials or services in connection with, or incidental to, construction of the Improvements.  Disbursements of Loan proceeds shall be made by Lender only to defray costs actually incurred by Borrower.  Disbursements on account of the direct costs of constructing the Improvements shall be limited to the lesser of (i) the actual cost to Borrower of work and labor performed on the Improvements and materials incorporated into the Improvements, or (ii) the actual value (as determined by Lender in its sole discretion) of such work and labor performed, less the retention, as provided in the Disbursement Schedule.  Disbursements on account of indirect or "soft" costs relating to the construction of the Improvements, the Loan, the preparation of the Plans, and the other services of the Architect, and all of the other transactions contemplated hereby, shall be limited to the

6

actual amounts of such costs as indicated by invoices, statements, vouchers, receipts or other written evidence satisfactory to Lender. Disbursements on account of the costs in the cost category described in any paragraph contained in the Disbursement Schedule shall be limited to that portion of the Loan Amount allocated to each such cost category set forth in the Disbursement Schedule, as limited by the Cost Breakdown. Subject to Paragraph 2.6.3 above, any Borrower's Funds held by Lender shall be disbursed in the same manner as Loan proceeds, except that Borrower's Funds shall be exhausted prior to disbursement of Loan proceeds. Without limiting the generality of any other provision of the Loan Documents, in the event that Lender determines subsequent to making any Disbursement that all conditions precedent to the making of all or any portion of such Disbursement have not been satisfied (such Disbursement or portion thereof hereinafter referred to as an "Overadvance"), Lender may, unless and until all conditions precedent to such Overadvance have been satisfied, either (i) require that the amount of the Overadvance be deposited in the Borrower's Funds Account or (ii) deduct the amount of the Overadvance from any subsequent Disbursement.

3.8    **Legal Lending Limit**. Notwithstanding anything stated to the contrary herein, in no event shall Lender be obligated to disburse any portion of the Loan Amount to Borrower, if such Disbursement would cause the aggregate amount outstanding on loans attributable to Borrower under any applicable statute, regulation or interpretation to exceed Lender's legal lending limit then in effect.

3.9    **Set Aside Letters**. From time to time, at Borrower's request, Lender may issue a letter (a "Set Aside Letter") to a governmental agency ("Obligee") or bonding company ("Surety") issuing a bond in favor of an Obligee, in which Lender agrees to allocate Loan proceeds for the construction of off-site, common area or other improvements ("Bonded Work") that Borrower is obligated to construct under an agreement with the Obligee ("Improvement Agreement"). In the event Lender decides to issue Set Aside Letters, such issuance shall be subject to the following conditions:

3.9.1    The Set Aside Letter shall be in form and substance satisfactory to Lender in its sole discretion, including any consent or acknowledgment Lender requires the Surety or Obligee to sign.

3.9.2    Borrower shall furnish a copy of the Improvement Agreement and budget for the Bonded Work to Lender, in form and substance satisfactory to Lender, prior to the issuance of the Set Aside Letter.

3.9.3    Borrower shall execute a "Request and Consent and Agreement" in connection with the Set Aside Letter in form and substance satisfactory to Lender, in which, among other things, Borrower shall (i) agree to indemnify and hold Lender harmless from any loss or expense under and in accordance with the Set Aside Letter; (ii) irrevocably authorize Lender to disburse Loan proceeds to the Obligee or Surety upon demand made under the Set Aside Letter; (iii) agree that any such disbursement under the Set Aside Letter shall be deemed a Disbursement to or for the benefit of Borrower under this Agreement; and (iv) represent and warrant to Lender, after due inquiry and investigation, that the sum which Borrower requests

7

Lender to allocate for the Bonded Work is sufficient to pay for the cost of constructing and completing the Bonded Work in accordance with the Improvement Agreement.

3.9.4    No Event of Default or circumstance which with notice, time or both could become an Event of Default shall have occurred and be continuing.

3.9.5    The Set Aside Letter shall not obligate Lender to advance funds after the Maturity Date (and no Set Aside Letter shall be issued if Lender reasonably determines that the costs intended to be covered thereby are not likely to be incurred prior to the Maturity Date).

3.9.6    The issuance of a Set Aside Letter shall reduce, by the amount set aside by the terms of such Set Aside Letter, the amount to be disbursed or set aside in the line item that includes such Set Aside Letter.

3.9.7    Lender shall have no obligation to release any security for the Loan or disburse any retention funds until Lender is reasonably satisfied that liability under all Set Aside Letters has been extinguished.

3.9.8    The amounts committed to be set aside under the Set Aside Letter shall be considered when determining if the Loan is "in balance."

3.9.9    In the event there are outstanding obligations of Lender under a Set Aside Letter at the time the Loan is due, whether on the Maturity Date or due to acceleration, Borrower shall provide cash collateral in the amount of such obligation and Lender shall be permitted to include such amount in its "credit bid" at any foreclosure sale of the Property.

4.    **CONDITIONS PRECEDENT TO CLOSING OF THE LOAN**.

Prior to recordation of the Deed of Trust and the closing of the Loan, Lender shall have received one (1) duly executed original of this Agreement, together with:

4.1    **Note**. The duly executed Note.

4.2    **Deed of Trust**. The duly executed and acknowledged Deed of Trust.

4.3    **Continuing Guaranty**. The duly executed Continuing Guaranty.

4.4    **Completion Guaranty and Agreement**. The duly executed Completion Guaranty and Agreement.

4.5    **UCC-1 Financing Statement**. A UCC-1 Financing Statement filed on behalf of Borrower reflecting Lender's security interest in any personal property located on the Project, and any other personal property collateral for the Loan required by Lender.

4.6    **Building Permits; Assignment**. The building permit(s) and any other permits, licenses and approvals (collectively, the "Permits") that may be required by the governmental

authorities having or exercising jurisdiction over the construction of the Improvements, in form and substance reasonably satisfactory to Lender, and an assignment to Lender on Lender's form of Borrower's interest in all such Permits, whether already issued to Borrower or to be obtained by Borrower in the future. In the event Borrower is unable to obtain and deliver to Lender all of such Permits, Borrower shall, prior to the recordation of the Deed of Trust and the closing of the Loan, deliver to Lender such evidence as Lender may require that such Permits are available to Borrower.

4.7    **Conditional Use Permits**. Evidence satisfactory to Lender that all conditions under any conditional use permit relating to the Project have been satisfied.

4.8    **Financial Statements**. The financial statements of Borrower and such other persons as Lender may designate, in form and substance satisfactory to Lender.

4.9    **Plans; Contractor's Agreement**. A copy of the first page of the Plans signed, and all other pages thereof initialed, by Borrower, the Contractor, if any, and, if required by Lender, together with a copy of the Construction Contract, if any.

4.10    **Construction Contract**. A copy of the general construction contract, if any (the "Construction Contract"), and a copy of each subcontract entered into by Borrower or by Contractor, as the case may be, if any, having a contract price equal to or greater than $25,000.00 (each, a "Subcontract" and together, the "Subcontracts").

4.11    **Assignment of Plans and Specifications and Construction Contract**. An assignment to Lender on Lender's form of Borrower's interest in the Plans and the Construction Contract, containing the Contractor's written consent thereto.

4.12    **Assignment of Construction Contract**. An assignment to Lender on Lender's form of the Construction Contract and the Contractor's written consent thereto.

4.13    **Insurance Policies**. Original insurance policies, certified copies thereof or certificates thereof for the insurance, as more fully provided in Paragraph 6 hereof.

4.14    **Preliminary Report of Title**. A preliminary report of title issued by the Title Insurer (as hereinafter defined) showing the condition of title to the Project and the Property's correct legal description, which description shall conform to the survey referred to in Paragraph 3.21 hereof, together with copies of all documents listed in such report as exceptions to title.

4.15    **Zoning**. Such evidence as Lender may require (including, without limitation, the written certification of the Engineer or any other person satisfactory to Lender and a copy of the applicable zoning ordinance covering the Project) that the zoning of the Project is satisfactory and compatible with the Improvements.

4.16    **Utilities**. Such evidence as Lender may reasonably require (including, without limitation, letters or other evidence from local utility companies or the governmental authorities

9

having or exercising jurisdiction over the Project) that electric, gas, sewer, water and telephone facilities will be available to the Project upon completion of the Improvements.

4.17    **Flood Plain Certification**.  Such evidence as Lender may require (including, without limitation, the written certification of the Engineer, or any other person satisfactory to Lender) that (i) the Project is not located within any flood plain or, if the Project is located within a flood plain, Borrower has obtained, and is maintaining in full force and effect, a policy or policies of flood insurance pursuant to Paragraph 6.1.2 hereof and (ii) the Project is not located within any area which is classified as a Major Damage Zone, Zones 3 and 4, by the International Conference of Building Officials.

4.18    **Compliance with CC&Rs**.  Such evidence as Lender may reasonably require that no covenants, conditions or restrictions affecting the Project are currently or will be violated by the Project or any portion thereof.

4.19    **Appraisal**.  An appraisal of the Project satisfactory to Lender, addressed to Lender and prepared by a licensed appraiser acceptable to Lender indicating the projected value thereof upon completion of the construction.

4.20    **ALTA Survey**.  A current ALTA survey of the Project prepared and certified by a surveyor or engineer licensed by the appropriate governmental authorities of the jurisdiction in which the Project is located, which survey shall include dimensions, delineations and locations of all easements and existing improvements on the Project and access thereto from public thoroughfares, and which shall be satisfactory to Lender and, if required by it, to the Title Insurer (as hereinafter defined).

4.21    **Soils Report**.  If required by Lender, a soils report and engineering study covering the Project, in form and substance satisfactory to Lender, prepared by a soils engineer acceptable to Lender and certified to Lender.

4.22    **Indemnity Agreement and Environmental Report**.  Indemnity Agreement and an Environmental Questionnaire and Disclosure Statement prepared by Borrower on Lender's form and, if required by Lender, an environmental audit covering the Project, in form and substance satisfactory to Lender, prepared by an environmental engineer acceptable to Lender and certified to Lender.

4.23    **Corporate Authority**.  If Borrower is a limited liability company (i) a copy of said company's Operating Agreement and any amendments thereto; (ii) a copy of the Articles of Organization filed with the Secretary of State; and (iii) a Certificate of Authorization executed by all of the members of such limited liability company authorizing the execution by such company of the applicable Loan Documents.

4.24    **Tax Payer Identification Number.**  A tax payer identification number issued by the Internal Revenue Service for the Borrower.

10

4.25     **Legal Opinion**.  If required by Lender, a written legal opinion from Borrower's counsel in form acceptable to Lender confirming to Lender the accuracy of the representations and warranties of Borrower set forth in Paragraphs 8.1, 8.2.2, 8.2.7, 8.2.9, 8.2.10, 8.7 and 8.8 hereof, and such other matters as Lender shall request.

4.26     **Environmental Opinion**.  If required by Lender, a written legal opinion from Borrower's counsel acceptable to Lender, or a written certification from a soils engineer, environmental risk consultant or other professional acceptable to Lender, confirming the accuracy of the representations and warranties of Borrower set forth in Paragraph 8.11 hereof.

4.27     **Lists of Names and Addresses**.  If required by Lender, a current, complete and correct list showing the name, address and telephone number of each contractor, subcontractor and material supplier engaged in connection with the construction of the Improvements, and the total dollar amount of each contract and subcontract (including any changes) together with the amounts paid through the date of the list, which list shall be updated periodically upon Lender's request.

4.28     **Estoppels and Nondisturbance and Attornment Agreements**.  If there are any leases of any part of the Property, (other than ordinary apartment leases those leases must be approved by Lender, and Lender must receive satisfactory estoppel certificates and subordination and attornment agreements executed by such tenants or proposed occupant of leased space in such forms as Lender may require.

5.     **TITLE INSURANCE**

5.1     **Basic Insurance**.  Concurrently with the recording of the Deed of Trust, Borrower shall deliver, or cause to be delivered to Lender, an ALTA Loan Policy of Title Insurance (the "Title Policy") issued by a title insurance company (and such re-insurers and co-insurers as Lender may require) acceptable to Lender (the "Title Insurer"), with a liability limit equal to the Loan Amount, and with coverage and in form satisfactory to Lender, insuring Lender's interest under the Deed of Trust as a valid first priority lien on the Project, together with such reinsurance (with direct access to the reinsurers thereunder), or co-insurance agreements and such endorsements to the Policy as Lender may require, which Policy shall contain only such exceptions from its coverage as shall have been approved in writing by Lender, and thereafter Borrower shall, at its own cost and expense, do all things necessary to maintain the Deed of Trust as a valid first priority lien on the Project.

5.2     **Continuation and Date-Down Endorsements**.  If required by Lender, after recordation of the Deed of Trust, and as a condition precedent to each Disbursement under Paragraphs 2.2 and 2.3 above, Borrower shall, at its own cost and expense, deliver or cause to be delivered to Lender, from time to time, such continuation and date-down endorsements to be attached to the Policy, in form and substance satisfactory to Lender, as Lender deems necessary to insure the lien priority of the Deed of Trust, as set forth in Paragraph 4.1 above, as of the date of and including the amount covered by each such Disbursement, and Borrower agrees to furnish to the Title Insurer such surveys and other information as are required by Lender or the Title Insurer to enable the Title Insurer to issue such endorsements to Lender.

LoanAgrInc  (REV 02/04/99)
109786.2

5.3     **Foundation Endorsements**.    Upon completion of the construction of any foundation on the Property, and as a condition precedent to any further Disbursements under this Agreement, Borrower shall, at Borrower's own cost and expense, deliver or cause to be delivered to Lender, a foundation endorsement with respect to each such foundation, in form and substance satisfactory to Lender, to be attached to the Title Policy, which endorsement shall insure that such foundation is within the boundary lines of the Property, does not violate any applicable covenants, conditions, restrictions or agreements affecting the Project which are referred to in the basic Title Policy, and does not encroach upon any easements, rights or rights of way affecting or covering the Project or any portion thereof.

6.     **CONSTRUCTION OF THE IMPROVEMENTS**.

6.1     **Commencement and Completion**.    Borrower shall cause construction of the Improvements to be prosecuted with due diligence, in good faith, and without delay, so that the Improvements will be completed not later than October 1, 2007 (the "Completion Date"), all in accordance with the schedule ("Completion Schedule") provided by Borrower and approved by Lender.  Borrower shall cause the Improvements to be constructed in a good and workmanlike manner in accordance with sound building practices as well as with the Plans, and in all respects in compliance with all applicable laws, rules, permits, requirements and regulations of any governmental agencies or authorities having or exercising jurisdiction over the Project, whether now existing or hereafter enacted, and with all recorded covenants and restrictions affecting the Property.  Borrower will not cause, permit or allow any deviations from the Plans without Lender's prior written consent thereto.  Upon written demand from Lender, Borrower shall, at Borrower's sole cost and expense, correct any defect in the Improvements or any departure from the Plans not theretofore approved in writing by Lender, and it is expressly understood and agreed that the advancement by Lender of any Loan proceeds shall not constitute a waiver of Lender's right to require compliance with this covenant with respect to any such defects or departures from the Plans not theretofore discovered by or called to the attention of Lender.

(i)     Borrower shall furnish to Lender on a monthly basis, or otherwise as may be required by Lender, a current construction progress schedule showing the progress of construction and the projected sequencing and completion times for uncompleted work, all as of the date of the schedule.

6.2     **Change Orders**.

6.2.1     Neither Borrower nor Contractor shall permit any material amendments or modifications of the Plans, the Construction Contract or any Subcontracts, or the performance of any work pursuant to such amendments or modifications without Lender's prior written consent thereto.  Borrower agrees to provide Lender with copies of all proposed change orders, together with all additional documents that Lender may reasonably require.  These documents may include the following: (i) plans and specifications indicating the proposed change; (ii) a written description of the proposed change and related working drawings; and (iii) a written estimate of the cost of the proposed change and the time necessary to complete it.

12

LoanAgrInc  (REV 02/04/99)
109786.2

6.2.2    Any amendment or modification proposed under Paragraph 5.2.1 shall be deemed "material" if:

(a)  it would result in an increase or decrease in the price payable under the Construction Contract or the Subcontracts in excess of Five Thousand and No/100 Dollars ($10,000.00); or

(b)  when added to the cumulative amount of all net increases or decreases in the prices payable under the Construction Contract or Subcontracts resulting from all such amendments and modifications theretofore permitted by Borrower or the Contractor, it would result in a net increase in the total price payable to Contractor under the Construction Contract or the total price payable under the Subcontracts in excess of Twenty Five Thousand and No/100 Dollars ($25,000.00); or

(c)  regardless of cost, it would involve a material structural, square footage or design change or diminution in the quality or utility of construction materials; or

(d)  it might adversely affect the value of Lender's security; or

(e)  it would cause any line item or category of the Cost Breakdown (or any detailed cost breakdown) to be increased or decreased by ten percent (10%) or more; or

(f)  it might delay completion of any element of the Improvements beyond the time allotted for it in the Completion Schedule, or completion of the Improvements beyond the Completion Date.

In addition, Borrower shall obtain Lender's prior written approval of all material changes in the scope or general conditions of the Construction Contract, the Architecture or Engineering Contract, or any other contracts for the construction of the Improvements.  Finally, Borrower shall obtain from the appropriate persons or entities all approvals of any changes in the Map or any plans, specifications, work, materials or contracts that are required in connection with the construction and completion of the Project, or under the terms of any loan commitment or other agreement relating to the Property.

6.2.3    Lender may take a reasonable time to evaluate any requests for proposed changes, and may require that all other approvals required from other parties be obtained before it reviews any requested change.  Lender may approve or disapprove changes in the exercise of its reasonable judgment.  Borrower acknowledges that delays may result, and agrees that so long as the delays are not unreasonable in duration, they shall not affect Borrower's obligation to complete each element of the Improvements according to the Completion Schedule, and all Improvements on or before the Completion Date.  Regardless of whether Lender's consent to any such amendment or modification is required hereunder, Borrower shall deposit with Lender, promptly upon Borrower's receipt of a written request from Lender, cash or current funds in an amount equal to any increase in the contract price resulting from such amendment or modification; such funds shall be disbursed by Lender in accordance with Paragraph 2 hereof and the Disbursement Schedule.

13

6.3    **Additional Conditions Precedent**.    No work of any character shall be commenced, nor shall any materials be delivered to the Project (unless already commenced or delivered with Lender's prior written consent), unless and until (i) the Title Policy has been received by Lender, or the Title Insurer has unconditionally committed to issue same, without limitation by the Title Insurer of any liability thereunder by reason of any such work or delivery of materials, (ii) such permits as are required for such work have been issued by the appropriate governmental authorities having or exercising jurisdiction over construction of the Improvements, (iii) Borrower or Contractor shall have obtained and, if required by Lender, shall have delivered to Lender copies of all licenses, permits, consents and approvals of all applicable governmental authorities, agencies and instrumentalities relating to the authorization of Borrower or the Contractor, (iv) if there is a Construction Contract, and if requested in writing by Lender, the Contractor shall have procured, at no expense to Lender, a performance bond and a labor and material payment bond issued in favor of Lender and Borrower as dual obligees by one or more financially responsible surety companies acceptable to Lender, each such bond to be in a penal sum equal to the total contract price payable to the Contractor under the Construction Contract, plus any other sums payable by Borrower with respect to the Plans or pursuant to all applicable laws, rules, permits, requirements and regulations of any governmental agencies or authorities having or exercising jurisdiction over the Property or the Improvements, and (v) if there is no Construction Contract, and if requested in writing by Lender, Borrower shall have procured, at no expense to Lender, a performance bond and a labor and material payment bond issued in favor of Lender by one or more financially responsible surety companies acceptable to Lender, each such bond to be in a penal sum equal to the total aggregate price payable by Borrower under all Subcontracts entered into by Borrower in connection with the Improvements, plus any other sums payable by Borrower with respect to the Plans, or pursuant to all applicable laws, rules, permits, requirements and regulations of any governmental agencies or authorities having or exercising jurisdiction over the Project.

7.    **INSURANCE**.

7.1    **Insurance Requirements**.    Borrower shall, at its sole cost and expense, insure and keep insured, the Project against such perils and hazards, and in such amounts and with such limits, as Lender may, from time to time require, and, in any event, including, insurance against loss to the Project, which during construction shall be on an "All Risk" perils "Builders' Risk," non-reporting "Completed Value" form and after completion of construction, shall be insurance against such other risks as Lender may reasonably require, including, but not limited to, insurance covering the cost of demolition of undamaged portions of any portion of the Project when required by code or ordinance, the increased cost of reconstruction to conform with current code or ordinance requirements and the cost of debris removal. In addition, during construction, such policies shall cover not less than twenty-five percent (25%) of soft costs, such as real estate property taxes; architect, engineering and consulting fees; legal and accounting fees, including, but not limited to, the cost of in-house attorneys and paralegals; advertising and promotion expenses; interest on money borrowed; additional commissions incurred upon renegotiating leases, and any and all other expenses which may be incurred as a result of any property loss or destruction by an insured. Such policies shall be in amounts equal to the full replacement cost of the Project (other than the Property), including the foundation and underground pipes, all

14

fixtures, equipment, construction materials and personal property on and off site, and Borrower's interest in any leasehold improvements. Such policies shall also contain a one hundred percent (100%) co-insurance clause with an agreed amount endorsement (with such amount to include the replacement cost of the foundation and any underground pipes) and deductibles which are in amounts acceptable to Lender.

7.1.1    Workers' Compensation. During the construction of or making of any alterations or improvements to the Project (i) insurance covering claims based on the owner's or employer's contingent liability not covered by the insurance provided in Paragraph 6.1.5 and (ii) workers' compensation insurance covering such of the persons engaged in such alterations or improvements as Lender may require.

7.1.2    Flood. Insurance against loss or damage by flood or mud slide in compliance with the Flood Disaster Protection Act of 1973, as amended from time to time, if the Project is now, or at any time while any of Borrower's obligations hereunder or under the other Loan Documents remain unpaid or unperformed, shall be, situated in any area which an appropriate governmental authority designates as a special flood hazard area, Zone A or Zone V, in amounts equal to the full replacement value of all above grade structures on the Project.

7.1.3    Earthquake. If required by Lender, insurance against loss or damage by earthquake in an amount equal to the probable maximum loss for the Project, fixtures and equipment, plus the cost of debris removal, if the Project is now, or at any time while any of Borrower's obligations hereunder or under the other Loan Documents remain unpaid or unperformed, shall be situated in any area which is classified as a Major Damage Zone, Zones 3 and 4, by the International Conference of Building Officials.

7.1.4    Public Liability. Commercial general public liability insurance against death, bodily injury and property damage arising in connection with the Project. Such policy shall be written on a 1986 Standard "ISO" occurrence basis form or equivalent form, shall list Borrower as the named insured, shall designate thereon the location of the Project and have such limits as Lender may reasonably require, but in no event less than $2,000,000.00.

7.1.5    Contractor's Insurance. During the entire period of construction, Borrower shall cause to be furnished to Lender, certificates from the insurance carrier for the Contractor evidencing workers' compensation, employers' liability, commercial automobile liability, excess umbrella liability coverage and commercial general liability insurance (including contractual liability and completed operations coverage) written on a 1986 standard "ISO" occurrence basis form, or its equivalent, with general liability insurance limits as Lender may reasonably require. Borrower shall cause each Subcontractor to maintain commercial general liability, commercial automobile liability, workers' compensation, employers' liability and excess umbrella liability coverage, in form and amount satisfactory to Lender.

7.1.6    Other Insurance. All insurance as is reasonable and customary in the operation of Borrower's business(es) and the maintenance of the Project, along with such other insurance relating to the Project and the use and operation thereof, as Lender may, from time to

LoanAgrInc  (REV 02/04/99)
109786.2

time, reasonably require, including, but not limited to, dramshop, products liability and non-owned aircraft.

7.2    **Policy Requirements**.  All insurance shall:  (i) be carried in companies with a Best's rating of B+VIII or better, or otherwise acceptable to Lender; (ii) be in form and content acceptable to Lender; (iii) provide thirty (30) days' advance written notice to Lender before any cancellation, adverse material modification or notice of non-renewal; and (iv) to the extent limits are not otherwise specified herein, contain deductibles which are in amounts acceptable to Lender.

All physical damage policies and renewals shall contain (i) a standard mortgage clause naming Lender as mortgagee, which clause shall expressly state that any breach of any condition or warranty by Borrower shall not prejudice the rights of Lender under such insurance; and (ii) a loss payable clause in favor of Lender (form 438 BFU or equivalent) for personal property, contents, inventory, equipment, loss of rents and business interruption.  All liability policies and renewals shall name Lender as an additional insured with such additional insured endorsement subject to Lender's approval and state that such insurance shall be primary and non-contributory to any other insurance of the additional insured.  No additional parties appear in the mortgage or loss payable clause without Lender's prior written consent.  All certificates of insurance and "blanket" insurance policies shall reference the specific project being covered by name and address.  All deductibles shall be in amounts acceptable to Lender.  In the event of the foreclosure of the Deed of Trust or any other transfer of title to the Project in full or partial satisfaction of the Loan, all rights, title and interest of Borrower in and to all insurance policies and renewals thereof then in force shall pass to the purchaser or grantee.

7.3    **Delivery of Policies**.  Any notice pertaining to insurance and required pursuant to this Paragraph 6 shall be given in the manner provided for notices in this Agreement.  The insurance shall be evidenced by the original policy or a true and certified copy of the original policy, or in the case of liability insurance, by certificates of insurance.  Borrower shall use its best efforts to deliver originals of all policies and renewals (or certificates evidencing the same), marked "paid" (or evidence satisfactory to Lender of the continuing coverage) to Lender at least fifteen (15) days before the expiration of existing policies and, in any event, Borrower shall deliver originals of such policies or certificates to Lender at least five (5) days before the expiration of existing policies.  If Lender has not received satisfactory evidence of such renewal or substitute insurance in the time frame herein specified, Lender shall have the right, but not the obligation, to purchase such insurance for Lender's interest only.  Any amounts so disbursed by Lender pursuant to this Paragraph 6.3 shall be a part of the debt secured by the Deed of Trust and shall bear interest at the Default Rate under the Note.  Nothing contained in this Paragraph 6.3 shall require Lender to incur any expense or take any action hereunder, and inaction by Lender shall never be considered a waiver of any right accruing to Lender on account of this Paragraph 6.3.

7.4    **Separate Insurance**.  Borrower shall not carry any separate insurance on the Project concurrent in kind or form with any insurance required hereunder, or contributing in the event of loss without Lender's prior written consent, and any such policy shall have attached a

16

standard non-contributing mortgagee clause, with loss payable to Lender, and shall otherwise meet all other requirements set forth herein.

7.5    **Notice of Casualty.**  Borrower shall give to Lender immediate notice of any loss occurring on or with respect to the Project.  In case of loss covered by any of such policies, Lender is authorized to adjust, collect and compromise, in its discretion, all claims thereunder and, in such case, Borrower covenants to sign upon demand, or Lender may sign or endorse on Borrower's behalf, all necessary proofs of loss, receipts, releases and other papers required by the insurance companies to be signed by Borrower.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact for the purposes set forth in the preceding sentence.  Lender may deduct from such insurance proceeds any expenses incurred by Lender in the collection and settlement thereof, including, but not limited to, attorneys' and adjusters' fees and charges.

7.6    **Application of Proceeds.**

7.6.1    If all or any part of the Project shall be damaged or destroyed by fire, earthquake or other casualty, or damaged or taken through the exercise of the power of eminent domain or other cause, Lender shall be reimbursed for all costs and expenses incurred to collect such proceeds and thereafter hold and disburse to Borrower as Borrower's Funds the net insurance proceeds, award or other compensation, proceeds from insurance (collectively, the "Proceeds"), and Borrower shall promptly and with all due diligence restore and repair the Project, whether or not the Proceeds are sufficient to pay the cost of such restoration or repair. Lender may require that all plans and specifications for such restoration or repair be submitted to and approved by Lender in writing prior to commencement of the work.  Lender shall apply excess Proceeds, if any, to the Loan in such order and manner as Lender may elect.  Borrower hereby expressly acknowledges and agrees that the insurance subject to the requirement that Lender hold and disburse to Borrower net insurance proceeds includes all casualty insurance obtained by Borrower in connection with the Project, including without limitation earthquake insurance, whether such casualty insurance is required or not required by Lender.

7.6.2    If the amount of the Proceeds to be made available to Borrower is less than the cost of the restoration or repair as estimated by Lender in its reasonable judgment, Borrower shall cause to be deposited with Lender the amount of such deficiency within thirty (30) days of Lender's written request therefor (but in no event later than the commencement of the work), and Borrower's Funds shall be disbursed prior to the disbursement of the Proceeds.  If Borrower is required to deposit funds under this Paragraph 6.6, the deposit of such funds shall be a condition precedent to Lender's obligation to disburse the Proceeds held by Lender hereunder.

7.6.3    In the event that the Proceeds, together with Borrower's Funds, are insufficient to restore the Property in such a fashion that Lender's security interest therein remains unimpaired, then at Lender's election, to be exercised by written notice to Borrower within thirty (30) days following Lender's unrestricted receipt in cash or the equivalent thereof of the Proceeds, the entire amount of the Proceeds shall either: (i) be applied to the Loan in such order and manner as Lender may elect or (ii) be made available to Borrower on the terms and conditions set forth in this Paragraph 6.6 to finance the cost of restoration or repair.

17

7.6.4    The amount of the Proceeds which is to be made available to Borrower, together with any deposits made by Borrower hereunder, shall be held by Lender to be disbursed from time to time to pay the cost of repair or restoration either, at Lender's option, to Borrower or directly to contractors, subcontractors, material suppliers and other persons entitled to payment in accordance with and subject to such conditions to disbursement as Lender may impose to assure that the work is fully completed in a good and workmanlike manner and paid for, and that no liens or claims arise by reason thereof. Lender may require (i) evidence of the estimated cost of completion of such restoration or repair satisfactory to Lender and (ii) such architect's certificates, waivers of liens, contractor's sworn statements, title insurance endorsements, plats of survey and other evidence of cost, payment and performance as are acceptable to Lender. If Lender requires mechanics' and materialmen's lien waivers in advance of making Disbursements, such waivers shall be deposited with an escrow trustee acceptable to Lender pursuant to a construction loan escrow agreement satisfactory to Lender. No payment made prior to final completion of the repair or restoration shall exceed ninety percent (90%) of the value of the work performed from time to time. Lender shall not commingle any such funds held by it with its other general funds. Lender shall not be obligated to pay interest in respect of any such funds held by it, nor shall Borrower be entitled to a credit against any portion of the Loan, except and to the extent the funds are applied thereto pursuant to this Paragraph 6.6. Without limitation of the foregoing, Lender shall have the right at all times to apply such funds to the cure of any Event of Default hereunder, or the performance of any obligations of Borrower under the Loan Documents.

7.6.5    Any controversy or claim between or among the parties arising out of or relating to this Paragraph shall at the request of any party be determined by arbitration. The arbitration shall be conducted in accordance with the Commercial Rules of the American Arbitration Association ("AAA"). The arbitrator(s) shall give effect to statutes of limitation in determining any claim. Any controversy concerning whether an issue is arbitrable shall be determined by, and judgment upon the arbitration award may be entered in, any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief, in accordance with Nevada Revised Chapter 38.

8.    **RIGHTS OF INSPECTION; AGENCY**.

8.1    **Rights of Inspection**.  Lender shall have the right at any time, and from time to time, to enter upon the Project for purposes of performing an appraisal, observing the work of construction and examining all materials, plans, specifications, working drawings and other matters relating to the construction. For purposes of these site visits, Borrower shall at all times maintain a full set of working drawings at the construction site. Lender shall also have the right to examine, copy and audit the books, records, accounting data and other documents of Borrower and its contractors which relate to the Property or construction of the Improvements. In each instance, Lender shall give Borrower reasonable notice before entering the Property. Lender shall make reasonable efforts to avoid interfering with Borrower's use of the Property when exercising any of the rights granted in this Paragraph 7.1.

18

8.2     **Protection of Lender's Rights; Agency**.  If Lender, in its judgment, determines that any work or materials are not substantially in conformity with the Plans, as the same were theretofore approved in writing by Lender, or with any applicable laws, regulations, permits, requirements or rules of any governmental authorities having or exercising jurisdiction thereover, or are not otherwise in conformity with sound building practice, Lender shall have the right to stop the work, to withhold Disbursements until the matter is corrected and to order replacement or correction of any such work or materials, regardless of whether or not such work or materials have theretofore been incorporated into the Improvements.  Any site visit, observation or examination by Lender shall be solely for the purpose of protecting Lender's rights and interest. No site visit, observation or examination by Lender shall impose any liability on Lender or result in a waiver of any default of Borrower.  In no event shall any site visit, observation or examination by Lender be a representation that there has been or shall be compliance with the Plans, that the construction is free from defective materials or workmanship, or that the construction complies with any applicable governmental law.  Neither Borrower nor any other party is entitled to rely on any site visit, observation or examination by Lender.  Lender owes no duty of care to protect Borrower or any other party against, or to inform Borrower or any other party of, any negligent or defective design or construction of the Improvements, or any other adverse condition affecting the Property.  Borrower may make, or cause to be made, such other independent inspections as Borrower may desire for its own protection, and nothing contained herein shall be construed as requiring Lender to construct or supervise construction of the Improvements.  Borrower hereby appoints and authorizes Lender, as Borrower's agent and attorney-in-fact, to record any notices of completion, cessation of labor and other notices that Lender deems necessary to record in order to protect any interest of Lender under the provisions of this Agreement or under the Note or the Deed of Trust.  This agency and power of attorney is a power coupled with an interest and is irrevocable.

9.     **REPRESENTATIONS AND WARRANTIES OF BORROWER**.

Borrower represents and warrants to Lender, which representations and warranties shall survive the termination of this Agreement, the repayment of the Loan, any investigations, inspections or inquiries made by Lender or any of Lender's representatives, the recording of the Deed of Trust and any Disbursements made by Lender hereunder, and which representations and warranties are true, accurate and correct as of the effective date of this Agreement, as follows:

9.1     **Organization; Corporate Powers; Authorization of Borrowings**.

9.1.1     Organization.  Borrower is a limited liability company, which has been duly organized and is validly existing and in good standing under the laws of the State of Nevada.

9.1.2     Good Standing.  Borrower is in good standing as a foreign corporation or partnership wherever necessary to carry on its present business and operations.

9.1.3     Power and Authority.  Borrower and Guarantor have full power and authority to execute the Loan Documents and to undertake and consummate the transactions contemplated hereby and thereby, and to pay, perform, and observe the conditions, covenants,

19

agreements and obligations herein and therein contained; and the Loan Documents have been duly and validly executed by Borrower and Guarantor and constitute the legal, valid and binding representations, warranties and obligations of Borrower and Guarantor and are and will continue to be enforceable under the laws of the State of Nevada (as hereinafter defined) in accordance with their respective terms, except as such enforcement may be qualified or limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally.

9.1.4    No Violations or Defaults Under Existing Agreements.  Borrower is not in violation of any law, regulation or ordinance, or any order of any court or governmental entity. The consummation of the transactions contemplated hereby and the performance by Borrower or by any other parties signatory thereto of their respective obligations under the Loan Documents will not result in any breach of, or constitute a default under, any mortgage, deed of trust, lease, bank loan or security agreement, or any other instrument to which Borrower or such other parties are a party, or by which Borrower or such other parties may be bound or affected.

9.1.5    Single Asset Entity.  Borrower is and shall remain a single asset entity and agrees that it will not engage in any activities related to or acquire any interest in any real property other than the Project or personal property not related to the Project without the prior written consent of Lender, which consent may be withheld in its sole discretion.

9.1.6    Not a Foreign Person.  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended from time to time.

9.2    **Title to Project; Matters Affecting Project.**

9.2.1    Title to Project.  Borrower has and will have good and marketable fee simple title (or if the Project is a leasehold estate, then leasehold title) to the Project, subject only to such exceptions as have been approved in writing by Lender; Borrower has and will have full power and lawful authority to encumber Borrower's interests in the Project pursuant to the terms of the Deed of Trust; Borrower will protect, or cause to be protected, the title to the Project and the status of the Deed of Trust as a perfected lien on and security interest in the Project, subject only to the exceptions approved in writing by Lender; and Borrower will forever warrant and defend the same against any other claims of any persons or parties whomsoever.

9.2.2    No Actions.  There are no claims, actions, suits or proceedings at law or in equity (including, without limitation, condemnation or eminent domain proceedings) currently pending, or to Borrower's knowledge threatened, against or affecting Borrower, or the Project, or involving the validity or enforceability of the Deed of Trust or the priority of the lien thereof, or for or by any governmental authority having or exercising jurisdiction over the Project, except as previously disclosed to Lender in writing.  Borrower will promptly notify Lender of any such future actions, suits or proceedings.  To Borrower's knowledge, Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or any governmental authority having or exercising jurisdiction over Borrower or the Project.

LoanAgrInc (REV 02/04/99)
109786.2

9.2.3   No Contracts Giving Rise to Liens. Borrower has made no contract or arrangement of any kind, the performance of which by the other party thereto would give rise to a lien on the Project, except for Borrower's arrangements with the Architect and the Contractor and those persons who will be supplying labor or materials in connection with the construction of the Improvements contemplated hereby.

9.2.4   Plans Approved. The Plans have been approved by Borrower and, to the extent required by applicable law or any effective restrictive covenant, have been approved by all governmental authorities having or exercising jurisdiction over the Project and the construction of the Improvements, and by the beneficiary of any such restrictive covenant, respectively; the Plans so approved have been initialed by Borrower and the Contractor; all construction of the Improvements heretofore performed, if any, has been performed within the perimeter of the Property in accordance with the Plans and restrictive covenants applicable thereto; and there are no structural defects in the Improvements, and no violation of any local requirement exists with respect thereto.

9.2.5   Utility Services. All utility services necessary for the construction of the Improvements and the operation thereof for their intended purposes either are available at the boundaries of the Project or all necessary steps have been taken by Borrower to insure the complete construction and installation of facilities for such services, including water supply facilities, storm and sanitary sewer facilities, and gas, electric and telephone facilities.

9.2.6   Roads. All roads necessary for the full utilization of the Improvements for their intended purposes either have been completed or the necessary rights-of-way therefor have been acquired by the governmental authority having or exercising jurisdiction over such matters or have been dedicated to public use and accepted by such governmental authority and all necessary steps have been taken by Borrower and such governmental authority to assure the complete construction and installation thereof.

9.2.7   Compliance with CC&Rs. Borrower is familiar and has complied with all covenants, conditions, restrictions, reservations regulations and ordinances affecting the Project. Borrower has properly obtained all permits, licenses and approvals necessary to construct, and lease the Property in accordance with all applicable laws, including those pertaining to zoning, and Borrower has delivered true and correct copies of them to Lender. Borrower will comply with all legal requirements relating to the conversion of apartment units in the Project to condominium units, including, without limitation, the requirements set forth in Nevada Revised Statutes ("NRS") Section 116.310395 and all other applicable provisions of NRS Chapter 116.

9.2.8   Personal Property. Any personal property required by Lender as additional security for the Note is vested in Borrower free and clear of all liens, encumbrances and adverse claims not disclosed in writing to and approved by Lender, and the security interest of Lender in the personal property shall be a first lien thereon.

9.2.9   Permits. All Permits required for the commencement of construction of the Project are in effect and will remain in effect, and the Project and its contemplated use and operation comply therewith, and Borrower shall obtain such additional Permits as necessary to

21

proceed with the construction of the Improvements and the completion, use and operation of the Project and shall maintain the Project's compliance therewith.

9.2.10    Taxes.  Borrower has filed all required state, Federal and local income tax returns and has paid all taxes which are due and payable.  Borrower knows of no basis for any additional assessment of taxes.

9.2.11    Loan in Balance.  The Loan is "in balance" and the undisbursed Loan funds, together with any of Borrower's Funds provided or to be provided, as shown in the Cost Breakdown, are sufficient to construct the Improvements and to accomplish the purposes contemplated by the Loan Documents.

9.2.12    Complete and Accurate Reports.  All reports, documents, instruments, information and forms of evidence which have been delivered to Lender concerning the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter.   None of them contains any misrepresentation or omission.

9.3    **Financial Statements**.  The financial statements heretofore and to be delivered to Lender by Borrower are and will be true and correct in all respects, have been or will be prepared in accordance with generally accepted accounting principles, consistently applied, and do or will fairly present the financial condition(s) of the person(s) referred to therein as of the date(s) indicated; no materially adverse change has occurred in the financial condition(s) reflected in such financial statements since the date(s) shown thereon and no additional borrowings or liabilities have been made or incurred by such person(s) since the date(s) thereof other than the borrowing contemplated hereby or other borrowings disclosed in writing to and approved by Lender.

9.4    **Submission of Requests for Disbursement**.   Each request for disbursement submitted by Borrower to Lender pursuant to Paragraph 2.4 hereof shall be true and accurate and the submission of each such request for disbursement or the receipt of funds so requested shall constitute a reaffirmation by Borrower of the representations, warranties and covenants contained herein.

9.5    **No Loan Broker**.  Borrower has not dealt with any person, firm or corporation who is or may be entitled to any finder's fee, brokerage commission, loan commission or other sum in connection with the execution of this Agreement, the consummation of the transactions contemplated hereby or the making of the Loan by Lender to Borrower, and Borrower does hereby indemnify and agree to defend and hold Lender harmless from and against any and all loss, liability or expense, including court costs and reasonable attorneys' fees and expenses, which Lender may suffer or sustain should such warranty or representation prove inaccurate in whole or in part.

9.6    **No Default**.  There is no default under any of the Loan Documents on the part of Borrower or the other parties signatory thereto, and no event has occurred and is continuing

LoanAgrInc  (REV 02/04/99)
109786.2

which, with the giving of notice or the passage of time, or both, would constitute a default under any thereof.

9.7     **Lawful Interest**.  The amounts to be received by Lender as interest payments under the Note shall constitute lawful interest and shall be neither usurious nor illegal under the laws of the State of Nevada.

9.8     **No Separate Insurance**.  Borrower does not carry any separate insurance whatsoever which is concurrent in form or contributing in the event of loss with that required under Paragraphs 4 and 6 hereof or under the Deed of Trust.

9.9     **RICO**.  To the best of Borrower's knowledge, there are no actions, suits or proceedings under the Racketeer Influenced and Corrupt Organization Act of 1970, 18 U.S.C. Sections 1961-1968 ("RICO"), or any other Federal or state law for which forfeiture of assets is a potential penalty (collectively, "RICO Related Laws"), currently pending or threatened against Borrower, Guarantor or any of Borrower's or Guarantor's partners, shareholders, parents, affiliates or subsidiaries.  Borrower will promptly notify Lender of any such future actions, suits or proceedings.

9.10    **ERISA**.  None of Borrower, Guarantor or their respective parents, subsidiaries or affiliates is an "employee benefit plan" (within the meaning of Section 3(3) off the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA") to which ERISA applies, and Borrower's and Guarantor's assets do not constitute assets of any such plan.

9.11    **Environmental Representations and Warranties**.

9.11.1    Definitions.  For purposes of this Agreement, the following capitalized terms shall have the meanings set forth below:

"Environmental Action" shall mean:

(a)  any notice of violation, complaint, claim, citation, demand, inquiry, report, action, assertion of potential responsibility, lien, encumbrance, or proceeding regarding the Project, whether formal or informal, absolute or contingent, matured or unmatured, brought or issued by any governmental unit, agency, or body, or any person or entity respecting:

(i)  any Environmental Law;

(ii)  the environmental condition of the Project, or any portion thereof, or any property near the Project, including actual or alleged damage or injury to humans, public health, wildlife, biota, air, surface or subsurface soil or water, or other natural resources; or

(iii)  any Hazardous Activity on the Project or off-site;

(b)  any violation or claim of violation by Borrower of any Environmental Law whether or not involving the Project;

23

(c) any lien for damages caused by, or the recovery of any costs incurred by any person or entity, including any governmental entity, for the investigation, remediation or cleanup of any Hazardous Release or threatened Hazardous Release on the Project; or

(d) the destruction or loss of use of property, or the injury, illness or death of any officer, director, employee, agent, representative, tenant or invitee of Borrower or any other person alleged to be or possibly to be arising from or caused by the environmental condition of the Project or any Hazardous Activity on the Project.

"Environmental Laws" shall mean:

(a) any present or future Federal statute, law, code, rule, regulation, ordinance, order, standard, permit, license, guidance document or requirement (including consent decrees, judicial decisions and administrative orders) together with all related amendments, implementing regulations and re-authorizations, pertaining to the protection, preservation, conservation or regulation of the environment, including, but not limited to: the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Re-authorization Act, 42 *U.S.C.* Sections 9601 *et seq.* (respectively, "CERCLA" and "SARA"); the Resource Conservation and Recovery Act of 1976, 42 *U.S.C.* Sections 6901 *et seq.* ("RCRA"); the Toxic Substances Control Act, 15 *U.S.C.* Sections 2601 *et seq.* ("TOSCA"); the Clean Air Act, 42 *U.S.C.* Sections 7401 *et seq.*; the Clean Water Act, 33 *U.S.C.* Sections 1251 *et seq.*; and the Hazardous Materials Transportation Act, 49 *U.S.C.* Sections 1801 *et seq.* ("HMTA");

(b) any present or future state or local statute, law, code, rule, regulation, ordinance, order, standard, permit, license or requirement (including consent decrees, judicial decisions and administrative orders), together with all related amendments, implementing regulations and re-authorizations, pertaining to the protection, preservation, conservation or regulation of the environment.

"Hazardous Materials Activity" shall mean any actual, proposed or threatened storage, holding, spill, leak, escape, leaching, dumping, migrating, release, emission, discharge, generation, processing, abatement, removal, disposition, handling or transportation of any Hazardous Materials in violation of any Environmental Laws from, under, into, onto or at the Property (including, without limitation, air, soil, groundwater and surface water on or under the Property, or the storm sewer, septic or waste treatment system servicing the Property) from any source, whether such source is located on the Property or off the Property, including that in connection with any investigation of site conditions or any clean-up, remedial, removal, or restoration work.

"Hazardous Materials" shall mean (i) all substances defined as "hazardous substances", "hazardous materials", "toxic substances", "hazardous wastes" or "solid waste" in CERCLA, SARA, RCRA, TOSCA or HMTA; (ii) those substances listed in the United States Department of Transportation Table (49 C.F.R. 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as "hazardous substances " (40 C.F.R. Part 302 and

24

amendments thereto); (iii) those substances defined as "hazardous wastes" in Section 459.430 of the *Nevada Revised Statutes* or as "hazardous substances" in Sections 40.504 and 459.429 of the *Nevada Revised Statutes*, and "hazardous wastes" in the regulations adopted and publications promulgated pursuant to such applicable local laws or which otherwise are or become regulated by any governmental authority, agency, department, commission, board or instrumentality of the United States of America, the State of Nevada or any political subdivision thereof; (iv) any hazardous, dangerous or toxic chemical, material, waste, pollutant, contaminant or substance (collectively, "Pollutants") within the meaning of any Environmental Law prohibiting, limiting or otherwise regulating any Hazardous Activity relating to any such Pollutant; (v) any petroleum, crude oil, or fraction or by-product thereof; (vi) any radioactive material, including any source, special nuclear or by-product material as defined at 42 U.S.C. Sections 2011 *et seq.*, as amended or hereafter amended, and in the regulations adopted and publications promulgated pursuant to such law; (vii) asbestos-containing materials in any form or condition; and (viii) polychlorinated biphenyls in any form or condition.

"Hazardous Release" shall mean the release of Hazardous Materials into the environment by any means whatsoever, including but not limited to any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping removing or disposing (including the abandonment or discarding of barrels, containers and other receptacles containing any Hazardous Material).

   9.11.2 Compliance with Environmental Laws. To the best of Borrower's knowledge based on all appropriate and thorough inquiry, the Project (including surface and subsurface soil and water and areas leased to tenants, if any), and the use and operation thereof, and Borrower have been and are currently in compliance with all Environmental Laws. All required Permits are in effect, and Borrower is in compliance therewith. All Hazardous Materials generated or handled on the Project have been disposed of in a lawful manner.

   9.11.3 No Hazardous Materials. To the best of Borrower's knowledge based on all appropriate and thorough inquiry (i) no Hazardous Materials Activity has occurred or is occurring on or from the Project except in compliance with Environmental Laws and as has been disclosed in writing to Lender ("Disclosed Material"), (ii) all Hazardous Materials used, treated, stored, transported to or from, generated or handled on the Project have been disposed of on or off the Project in a lawful manner, (iii) no environmental or public health or safety hazards currently exist with respect to the Project or the business or operations conducted thereon, (iv) no underground storage tanks (including but not limited to petroleum or heating oil storage tanks) are present on or under the Project, or have been or under the Project, except as has been disclosed in writing to Lender and (v) there have been no changes made to or discovered as to the operations, use or environmental conditions on the Project since the date of the most recent written environmental assessment provided to Lender.

   9.11.4 No Environmental Actions. To the best of Borrower's knowledge and based on all appropriate and thorough inquiry, the Property is not listed on any local, state and/or Federal lists of potentially contaminated sites, including, but not limited to, the National Priorities List, Comprehensive Environmental Response, Compensation and Liability Information System or any state or Federal hazardous waste site or leaking underground storage

25

tank lists, and there have been no past and there are no pending or threatened Environmental Actions to which Borrower is a party or which relate to the Project. Borrower has not received any notice of any Environmental Action respecting Borrower, the Project or any off-site facility to which has been sent any Hazardous Materials for purposes of any Hazardous Materials Activity.

      9.11.5    **Intentionally Omitted**.

      9.11.6    Construction of Improvements. The construction of the Improvements or any other improvements on the Project will not result in any violation of any applicable building, moratorium, or coastal management zone law, regulation or ordinance, or any Environmental Law; and all necessary environmental impact statements relating to such construction have been prepared by Borrower or by other parties responsible therefor and filed with and favorably and finally acted upon by all governmental offices and/or officials having jurisdiction, or no such environmental impact statements are required to have been filed with or acted upon by any governmental office or official.

## 10.    COVENANTS OF BORROWER.

      Until the full and final payment of the Loan, unless Lender waives compliance in writing, Borrower hereby covenants and agrees as follows:

    10.1    **Loan Covenants**.

      10.1.1    Receipt of Loan Proceeds. Borrower shall receive the Disbursements to be made hereunder as a trust fund for the purpose of paying the direct and indirect costs of constructing the Improvements, and shall apply the same first to such payment before using any part thereof for any other purpose.

      10.1.2    Budget Balancing. At the time and in the amounts required by Lender, Borrower shall deposit funds in Borrower's Funds Account should it appear at any time that the Loan is not "in balance" in accordance with the provisions of Paragraph 2.6 hereof; such funds shall be disbursed from such account in the manner provided herein.

    10.2    **Documents to be Delivered to Lender**.

      10.2.1    Title Documents. Borrower shall deliver to Lender, on demand, any contracts, bills of sale, statements, receipted vouchers or agreements under which Borrower claims title to any materials, fixtures or articles incorporated into the Improvements.

      10.2.2    Certificates of Occupancy. Borrower shall obtain and deliver to Lender written evidence that all governmental authorities having or exercising jurisdiction over the Project or the construction of the Improvements have approved the Improvements in their entirety for permanent occupancy to the extent that any such approval is a condition of the lawful use and occupancy of the Improvements.

LoanAgrInc (REV 02/04/99)
109786.2

10.3    **Prohibited Work**.

10.3.1    Violation of Change Order Requirements.  Borrower shall not permit the performance of any work pursuant to any change order which will result in a violation of Paragraph 5.2 hereof.  Borrower shall require a written covenant from the Contractor to the same effect as the covenant made by Borrower in the foregoing sentence, and a further covenant that the Contractor will, upon request, deliver to Lender the names of all persons with whom the Contractor has contracted or intends to contract for the construction of the Improvements or the furnishing of labor or materials therefor.

10.3.2    Reversionary Interests.  Borrower shall not install materials, personal property, equipment or fixtures subject to any security agreement or other agreement or contract wherein the right is reserved to any person, firm or corporation to remove or repossess any such materials, equipment or fixtures, or whereby title to any of the same is not completely vested in Borrower at the time of installation, without Lender's prior written consent.

10.4    **Construction and Maintenance of Project**.

10.4.1    Completion of Foundation.  Borrower shall notify Lender in writing immediately upon completion of the foundation(s) of the Improvements, unless such foundation(s) have been completed at the date hereof.

10.4.2    Record Keeping.  Borrower shall keep and maintain full and accurate accounts and records of Borrower's operations according to sound accounting practices for Borrower's type of business.

10.4.3    Payment of Lawful Claims.  Borrower shall pay or discharge all lawful claims, including taxes, assessments and governmental charges or levies imposed upon Borrower or its income or profits or upon any property belonging to Borrower prior to the date upon which penalties attach thereto.  Without limiting the generality of the foregoing, Borrower shall pay (i) all taxes and recording expenses, including stamp taxes, if any, relating to the Deed of Trust and any other documents and instruments securing the Loan, (ii) the fees and commissions, if any, lawfully due to brokers in connection with this transaction and hold Lender harmless from all such claims, whether or not lawfully due, and (iii) the fees and expenses of Lender's counsel relating to Lender's consultation with such counsel in connection with the Loan, the negotiation, documentation and closing of the Loan, any subsequent modifications of the Loan and the funding of the permanent loan(s) to be made to Borrower pursuant to the Permanent Commitment.

10.4.4    Compliance with Governmental Requirements.  Borrower shall comply promptly with the requirements of any governmental authorities having or exercising jurisdiction over the Project. Without limiting the generality of the foregoing, Borrower shall comply with all of the regulations of the Worker's Compensation Act, and will under no circumstances employ day labor.

27

10.4.5    No Amendments.  Borrower shall not enter into any amendments or modifications of (i) the Architecture Contract, (ii) the Permanent Commitment, (iii) the insurance policies required by Paragraph 6 hereof, (iv) any major leases covering the Project or any portions thereof, (v) if Borrower is a corporation, Borrower's by-laws and articles of incorporation, or (vi) if Borrower is a partnership, Borrower's partnership agreement, without Lender's prior written consent.

10.4.6    General Contractor.  Borrower shall not replace the Contractor, enter into any material modifications of the Construction Contract, except as permitted by this Agreement, or fail to perform Borrower's covenants thereunder, without Lender's prior written consent, which may be given or withheld in Lender's sole discretion.

10.5    **Restricted Transfer and Encumbrance of Project**.  Borrower shall not sell, convey, transfer, dispose of or further encumber the Project or any part thereof or any interest therein (except that Borrower may transfer up to forty nine percent (49%) of ownership interests in borrower so long as Roni Amid remains a manager of Borrower) or, except as otherwise provided in the Deed of Trust or this Agreement, enter into a lease covering all or any portion thereof or an undivided interest therein, either voluntarily, involuntarily or otherwise, or enter into an agreement so to do without the prior written consent of Lender being first had and obtained, or should any holder of an equity interest in Borrower transfer or encumber such interest, whether voluntarily, involuntarily or otherwise (any such event, an "accelerating transfer"), then Lender may at its option declare all sums secured hereby immediately due and payable.  This provision shall apply to each and every sale, conveyance, transfer, disposition or encumbrance, regardless of whether or not Lender has consented to, or waived, its right hereunder, whether by action or non-action, in connection with any previous sale, conveyance, transfer, disposition or encumbrance, whether one or more. All easements, declarations of covenants, conditions and restrictions and private and public dedications affecting the Project shall be submitted to Lender for its approval, which approval shall not be unreasonably withheld and such approval shall be obtained prior to the execution or granting of any thereof by Borrower, accompanied by a drawing or survey showing the precise location of each thereof.

10.6    **Environmental Covenants**.

10.6.1    Compliance with Environmental Laws.  Borrower shall comply, and shall cause the Project and all employees, agents, contractors and subcontractors of Borrower and any other persons occupying or present on the Project, to comply with all Environmental Laws.  All required Permits shall be obtained and shall remain in effect, and Borrower shall comply therewith.  All Hazardous Materials present, handled or generated on the Project will be disposed of in a lawful manner without giving rise to liability under any Environmental Laws. Borrower shall satisfy all requirements of applicable Environmental Laws for the registration, operation, maintenance, closure and removal of all underground storage tanks on the Project, if any. Without limiting the foregoing, all Hazardous Materials shall be handled, and all Hazardous Activity shall be conducted, in compliance with all applicable Environmental Laws.

28

10.6.2    No Hazardous Materials.  Other than Disclosed Material, no Hazardous Substances shall be the subject of any Hazardous Substance Activity on the Project without Lender first having received thirty (30) days' prior written notice thereof.

10.6.3    Environmental Actions.  Borrower shall immediately notify Lender of all Environmental Actions and shall provide copies, within two business days of receipt, of all written notices, complaints, correspondence, or other documents relating thereto.  Borrower shall keep Lender informed of all actions Borrower takes in connection with such Environmental Actions.  Borrower shall promptly cure and have dismissed with prejudice all Environmental Actions in a manner satisfactory to Lender, and Borrower shall keep the Project free of any encumbrance arising from any judgment, liability or lien imposed pursuant to any Environmental Actions.  Notwithstanding the foregoing sentence, Borrower may, diligently, in good faith and by appropriate legal proceedings, contest any Environmental Action, provided: (i) Borrower first furnishes to Lender such deposits or other collateral as Lender, in its sole discretion, deems sufficient to fully protect Lender's interests; (ii) such contest shall have the effect of preventing any threatened or pending sale or forfeiture of all or any portion of the Project arising from such Environmental Action or the loss or impairment of Lender's lien and security interests in and to the Project; and (iii) such contest shall not cause Lender to incur any liability, in Lender's sole judgment.  Borrower shall permit Lender, at Lender's option, to appear in and to be represented in any such contest and shall pay upon demand all expenses incurred by Lender in so doing, including attorneys' fees.

10.6.4    Compliance with Environmental Representations, Warranties and Covenants; Environmental Audits.  Borrower shall provide such information and certifications as Lender may reasonably request from time to time to insure Borrower's compliance with Paragraphs 8.11 and 9.6 hereof for the sole purpose of protecting Lender's security interest.  To protect its security interest, Lender shall have the right, but not the obligation, at any time to enter upon the Project, take samples, review Borrower's books and records, interview Borrower's employees and officers, and conduct such other activities as Lender, in its sole discretion, deems appropriate.  Borrower shall cooperate fully in the conduct of such an audit.  In the event Lender exercises the audit rights set forth herein as a result of (i) an Environmental Action; (ii) a default by Borrower under this Agreement or any of the other Loan Documents; (iii) a change in the use of the Project that, in Lender's sole and absolute opinion, increases the risk to Lender's security interest; or (iv) the introduction of Hazardous Materials other than Disclosed Material to the Project, then Borrower shall pay upon demand all costs and expenses incurred by Lender in connection with such audit.  Failure of Borrower to pay all of such costs and expenses within five days of demand from Lender shall result in the sum total of such costs and expenses incurred by Lender being deemed additional indebtedness secured by the Loan Documents and bearing interest at the Default Rate of interest set forth in the Note.  Nothing in this Paragraph 9.6 shall give or be construed as giving Lender the right to direct or control Borrower's actions in complying with Environmental Laws.

10.6.5    Environmental Indemnity.   Borrower shall, at Borrower's expense, protect, defend (at trial and appellate levels and with counsel, experts and consultants acceptable to Lender at Borrower's sole cost), indemnify, save and hold Lender and its Affiliates (as hereinafter defined) free and harmless from and against any and all losses, liabilities, obligations,

29

fines, penalties, charges, claims, litigation, demands, defenses, costs, judgments, suits, administrative or judicial proceedings or orders, remedial action requirements, lost profits, enforcement actions of any kind, damages (including, without limitation, consequential damages, punitive damages, exemplary damages, diminution in value of the Project, damages for the loss or restriction of use of the Project, damages arising from any adverse impact on marketing the Project and sums paid in settlement of claims), Disbursements or expenses of any kind or nature whatsoever (including attorneys' fees at trial and appellate levels, consultants' fees and experts' fees and disbursements and expenses incurred in investigating, defending against, settling or prosecuting any suit, litigation, claim or proceeding) which may at any time be directly or indirectly imposed upon, incurred by or asserted or awarded against Lender or any of Lender's parent or subsidiary corporations, or their affiliates, shareholders, directors, officers, employees, or agents (collectively, "Affiliates") in connection with or arising from:

        (a)  any Hazardous Material or Hazardous Materials Activity on, in, under or affecting all or any portion of the Project, or any surrounding areas;

        (b)  any misrepresentation, inaccuracy or breach of any warranty, covenant or agreement contained or referred to in Paragraphs 8.11 and 9.6 hereof;

        (c)  any claimed or actual violation by Borrower of, or liability of Borrower under, any Environmental Laws;

        (d)  the imposition of any lien for damages caused by, or the recovery of any costs for the cleanup, release or threatened release of, Hazardous Materials; or

        (e)  any Environmental Actions.

    The foregoing indemnification, defense and hold harmless obligations contained in this Paragraph 9.6.5 shall (i) apply to any residual contamination on or under the Project, or affecting any natural resources, and to any contamination of any property or natural resources arising in connection with any Hazardous Materials Activity, and irrespective of whether any of such Hazardous Materials Activities were or will be undertaken in accordance with applicable Environmental Laws, and (ii) survive repayment of the Note or any transfer of the Project by foreclosure or by a deed or assignment in lieu of foreclosure.

    Borrower, on behalf of itself and its successors and assigns, hereby waives, releases and agrees not to make any claim or bring any cost recovery action against Lender under or with respect to any Environmental Laws. Borrower's obligation to Lender under this indemnity shall likewise be without regard to fault on the part of Borrower or Lender with respect to the violation or conditions which results in liability to Lender.

    10.6.6    Lender's Right To Rely.  Lender is entitled to rely upon Borrower's representations, warranties and covenants contained in this Paragraph 9.6 and in Paragraph 8.11 above notwithstanding any independent investigations by Lender or its consultants. Borrower shall take all necessary actions to determine for itself, and to remain aware of, the environmental condition of the Project and shall have no right to rely upon any independent environmental

LoanAgrInc  (REV 02/04/99)
109786.2

investigations or findings made by Lender or its consultants unless otherwise stated in writing therein and agreed to in writing by Lender.

10.7    **General Indemnity**. Borrower shall, at Borrower's expense, protect, defend, indemnify, save and hold Lender harmless against any and all liabilities, claims, demands, losses, expenses, damages, causes of action (whether legal or equitable in nature) asserted by any person or entity arising out of, caused by or relating to the Loan, including without limitation the construction of the Improvements and the use or application of the proceeds of the Loan, and Borrower shall pay Lender upon demand all claims, judgments, damages, losses and expenses (including court costs and reasonable attorneys' fees and expenses) incurred by Lender as a result of any legal or other action arising out of the Loan as aforesaid.

10.8    **Indemnity for Claims of Contractors**. Lender shall not be liable to, and Borrower shall save Lender harmless against liability for and the claims of, materialmen, contractors, subcontractors, laborers and others for goods delivered by them to the Project or services performed by them in or upon the Project or otherwise in connection with the Project. Borrower is not and shall not be considered to be the agent of Lender for any purpose.

10.9    **Financial Statements**.

10.9.1    Annual Financial Reports.  Within 120 days after the end of each fiscal year, Borrower shall deliver to Lender a copy of its and any Guarantor's balance sheet, income statement and statement of changes in financial position for such fiscal year. Each such annual report shall (i) include a schedule of all material contingent liabilities and all other notes and schedules relating thereto, (ii) be in a form reasonably satisfactory to Lender, and (iii) be prepared in accordance with sound accounting principles consistently applied.

10.9.2    Other Financial Reports.  If required by Lender, within 45 days after the end of each of the first three quarters of each fiscal year, Borrower shall deliver to Lender (i) a statement of Borrower's and any Guarantor's net operating income from the Project and (ii) financial statements for the quarter including Borrower's unaudited balance sheet, income statement and statement of changes in financial position for such quarter.  Such quarterly financial statements shall (I) include a schedule of all material contingent liabilities and all other notes and schedules relating thereto, (II) be in a form reasonably satisfactory to Lender, (III) be prepared in accordance with generally accepted accounting principles consistently applied, and (IV) be certified by Borrower's chief financial officer.

10.9.3    Tax Returns.  Within 15 days of the date of which they are required to be filed, Borrower shall provide a copy of the Borrower's and any Guarantor's federal and state tax returns and all schedules attached thereto, or if Borrower or any Guarantor has requested an extension within which to file such returns, a copy of all the forms filed in connection with such requests for extension.

10.9.4    Guarantor Liquidity.  Borrower shall cause Guarantor to maintain, at all times, no less that One Million Dollars ($1,000,000) in unencumbered marketable securities to be verified in accounts of either Roni Amid and/or parent companies (Founder's Development

31

Inc., or West Nevada Management Inc.) owned one hundred percent (100%) by Roni Amid, during the loan period. Within thirty (30) days of the quarter ending, compliance to be measured on a quarterly basis beginning June 30, 2006.

**Notices**. Borrower shall promptly notify Lender in writing of:

(i)  Any litigation affecting Borrower or if Borrower is a partnership, any general partner of Borrower, or Guarantor or indemnitor, where the amount claimed is Fifty Thousand Dollars ($50,000) or more;

(ii)  Any communication, whether written or oral, that Borrower may receive from any governmental, judicial or legal authority, giving notice of any claim or assertion that the Property or any Improvements fail in any respect to comply with any applicable governmental law;

(iii)  Any material adverse change in the physical condition of the Property (including any damage suffered as a result of earthquakes or floods) or Borrower's financial condition or operations; and

(iv)  Any default by the Contractor or any Subcontractor, material supplier or surety, or any material adverse change in the financial condition or operations of any of them.

10.10  **Continuing Representations and Warranties**.  Borrower warrants and covenants that the representations and warranties contained in Paragraph 8 will be true at the date of this Agreement and at the dates of all subsequent Disbursements of the Loan, and each request for disbursement made by Borrower hereunder shall constitute an affirmation by Borrower that such warranties and representations are true and correct as of the date of such request for disbursement with the same force and effect as if made on such date.

11.  **APPRAISALS**.

Borrower acknowledges Lender's right to obtain a new appraisal or update an existing appraisal of the Project at any time while the Loan or any portion thereof remains outstanding (i) when, in Lender's reasonable judgment, such an appraisal is warranted as a result of Lender's internal evaluation of the Loan and/or (ii) to comply with statutes, rules, regulations or directives of governmental agencies having jurisdiction over Lender; provided no more than one appraisal each calendar year shall be commissioned.  Further, Borrower hereby agrees to pay, upon demand, all appraisers' fees and related expenses incurred by Lender from time to time in obtaining appraisal reports.

12.  **DEFAULTS**.

Any obligation of Lender to make Disbursements hereunder shall, at the option of Lender, exercisable in its own discretion, and after written notice as provided below has been given therefor, terminate without further notice or demand upon the occurrence of any of the following events (each, an "Event of Default"); provided, however, that Borrower shall automatically be in

LoanAgrInc  (REV 02/04/99)
109786.2

default under this Agreement and all obligations of Lender hereunder shall terminate, without the necessity for any action or election by Lender, upon the occurrence of any of the Events of Default described in Paragraphs 11.9, 11.10 and 11.11 hereof and the expiration of any applicable curative period provided therein:

12.1    **Failure to Perform Under this Agreement**.  Failure in the due, prompt and complete observance or performance of any condition, covenant or obligation of Borrower set forth herein (other than the obligation to pay or deposit money or any other breach or default described elsewhere in this Paragraph 11) for a period of thirty (30) days after written notice to Borrower from Lender specifying the nature thereof. Notwithstanding the foregoing, if Lender determines, in its reasonable discretion, that Borrower's compliance with the covenants set forth in Paragraph 9.6 hereof are not susceptible to correction within such 30-day period, and if Borrower has promptly commenced and diligently pursues action to cure such non-compliance to Lender's satisfaction, then Borrower shall have such additional time as is reasonably necessary to correct such non-compliance, provided Borrower continues to diligently pursue corrective action, but in no event more than a total of ninety (90) days after the initial notice of non-compliance by Lender.

12.2    **Failure to Perform Under Other Loan Documents**.  Failure in the due, prompt and complete observance or performance of (i) any condition, covenant or obligation of Borrower set forth in any of the Loan Documents (other than this Agreement), including without limitation the obligation to make principal and interest payments under the Note or any other documents or instruments made in connection with a loan or loans relating to the Project, whether now existing or hereafter arising, after giving effect to the express curative provisions (if any) therein provided, or (ii) the obligation to deposit moneys into Borrower's Funds Account as required.

12.3    **Discontinuance of Construction**.  Borrower or the Contractor does not proceed continuously with construction of the Improvements or construction thereof is otherwise discontinued for a period of twenty (20) days or more for any reason or cause within the reasonable control of Borrower or the Contractor or any Subcontractor, or the shell and core of the Improvements are not completed by the Completion Date.

12.4    **Enjoinder of Construction or Performance of Obligations**.  The making of any order or the entry of any decree by a court of competent jurisdiction enjoining construction of the Improvements or enjoining or prohibiting Borrower and Lender, or either of them, from performing or satisfying their respective covenants, obligations or conditions contained herein and such proceedings are not discontinued or such order or decree is not vacated within thirty (30) days after the making or granting thereof.

12.5    **False or Misleading Representation or Warranty**.  Any representation or warranty by Borrower to Lender with respect to the Project or Borrower's financial condition or credit standing, or any other representation or warranty of Borrower contained herein, proves to be false or misleading in any material respect.

33

12.6    **Failure to Maintain Permits or Insurance**.  Borrower neglects, fails or refuses to keep in full force and effect any Permit or approval with respect to construction of the Improvements, any policy or policies of insurance or title insurance, or any other undertakings required hereunder.

12.7    **Service of Bonded Stop Notice**.  The service upon Lender, in accordance with the laws of the jurisdiction in which the Project is located, of a bonded stop notice from Contractor and Sub-Contractor and within ten (10) business days after Lender's receipt of such notice either (i) the claim set forth therein is not discharged by Borrower or (ii) if the amount claimed is disputed in good faith by Borrower or the Contractor or the Sub-Contractor, Borrower fails to deliver to Lender a stop notice release bond, in form and substance and issued by a surety company acceptable to Lender, insuring Lender against such claim.

12.8    **Failure to Discharge Mechanics' Liens**.  The filing for record of a mechanic's lien or materialman's lien against the Project and within twenty (20) business days after the filing thereof either (i) the claim set forth therein is not discharged by Borrower or (ii) if the amount claimed is disputed in good faith by Borrower or the Contractor, Borrower fails to deliver to Lender a mechanic's lien release bond, in form and substance and issued by a surety company acceptable to Lender, insuring Lender against such claim or pursuant to which the Project will be released from such lien and from any action brought to foreclose such lien.

12.9    **Insolvency**.  Borrower or any Guarantor becomes insolvent or unable to pay its debts as they mature.

12.10    **Voluntary Petition in Bankruptcy**.  The making of an assignment for the benefit of creditors by Borrower or any Guarantor or the appointment of a receiver of the property of Borrower or any Guarantor, or the filing by Borrower or any Guarantor of a petition in bankruptcy or other similar proceeding under law for relief of debtors.

12.11    **Involuntary Petition in Bankruptcy**.  The filing against Borrower or any Guarantor of a petition in bankruptcy or other similar proceeding under law for relief of debtors, and such petition is not dismissed within sixty (60) calendar days after the filing thereof.

12.12    **Default Under Construction Contract**.  Failure in the due, prompt and complete observance or performance of any condition, covenant or obligation of Borrower contained in the Architecture or Engineering Contract, the Construction Contract, any other contract for the construction of the Improvements, either (i) for an initial cure period of thirty (30) consecutive days, or (ii) for a total period of ninety (90) days, so long as Borrower begins within such initial cure period and diligently continues to cure the default, and Lender, exercising reasonable judgment, determines that the cure cannot reasonably be completed at or before expiration of such initial cure period.

12.13    **Accelerating Transfer**.  An Accelerating Transfer (as defined in the Deed of Trust) occurs.

34

12.14    **Default Under Any Other Obligation of Borrower to Lender**.  The occurrence of any event that would constitute a default under any other obligation of Borrower to Lender made in connection with or relating to the Project whether now existing or hereafter arising.

12.15    **Death or Dissolution**.  Borrower dies, dissolves or liquidates, or any of these events happens to any of Borrower's general partners or to its chief executive or majority shareholder or to Guarantor, if any.

12.16    **Principal Officer**.  Borrower's managing general partner or its chief executive or any of its trustees, as applicable, ceases for any reason to act in that capacity.

12.17    **Filing of Charges Under RICO**.  The filing of formal charges, including without limitation the issuance of an indictment, by any governmental or quasi-governmental entity under RICO or any RICO Related Law, against Borrower or any of Borrower's partners, shareholders, parents, affiliates or subsidiaries.

13.    **REMEDIES**.

13.1    **Actions upon Default**.  If any Events of Default hereunder shall occur and Borrower fails to cure the same within the express time period, if any, herein provided, Lender, in addition to any other rights of Lender under the Loan Documents or at law or in equity, all of which rights shall be cumulative, may at its option and without prior notice or demand:

13.1.1    Acceleration.  Declare the unpaid principal balance of the Note and all accrued but unpaid interest thereon immediately due and payable, except that Lender may, but shall not be obligated to, make any advances after the happening of any one or more of the Events of Default without thereby waiving the right to demand payment in full of the Note and without liability to make any other or further advances; and/or

13.1.2    Possession.  Enter and take possession of the Project or any portion thereof, whether in person, by agent or by court-appointed receiver, and perform any and all work and labor necessary to complete the Improvements substantially in accordance with the Plans, and all sums expended by Lender for all such purposes shall be deemed disbursed to Borrower, bearing interest at the Default Rate under the Note and shall be secured by the Deed of Trust.  If Lender chooses to complete the Improvements, it shall not assume any liability to Borrower or any other person for completing or the failure to complete the Improvements, or for the manner or quality of construction of the Improvements, and Borrower expressly waives any such liability.    If Lender exercises any of the rights or remedies provided in this Paragraph 12.1.2, that exercise shall not make Lender, or cause Lender to be deemed to be, a partner or joint venturer of Borrower.

13.2    **Appointment of Lender as Attorney-in-Fact**.  Borrower hereby constitutes Lender as Borrower's attorney-in-fact, with full power of substitution, to take possession of the Project and complete construction of the Improvements or, alternatively, to complete construction of the Improvements without taking possession of the Project, and hereby empowers Lender at any time: (i) to use any funds of Borrower held by Lender and any funds

35

which may remain undisbursed hereunder for the purpose of completing construction of the Improvements; (ii) to make such additions, changes and corrections in the Plans as Lender in its sole discretion deems necessary or desirable to complete construction of the Improvements; (iii) to employ such contractors, subcontractors, agents, architects and inspectors as are required for such purposes, and to employ watchmen to protect the Project from damage; (iv) to pay, settle or compromise all existing bills and claims which may be liens against the Project or any portion thereof, which may be claims against the funds of Borrower held by Lender or any funds which may remain undisbursed under the Note, or which it may be necessary or desirable to pay, settle or compromise, as Lender in its sole discretion deems necessary or proper for the completion of construction of the Improvements or for the protection of title to the Project or any portion thereof or for the protection of Lender's interest with respect thereto; (v) to prosecute and defend all actions and proceedings in connection with the construction of the Improvements; and, (vi) as Lender in its sole discretion deems necessary or proper, to execute, acknowledge (when appropriate) and deliver all instruments and documents in the name of Borrower which may be necessary or desirable in order to do any and every act which Borrower might do on its own behalf. This power of attorney is a power coupled with an interest and is irrevocable.

13.3    **Provisional Remedies, Self-Help and Foreclosure**.  No provision of this Paragraph 12 shall limit the right of any party to this Agreement to exercise self-help remedies such as setoff, foreclosure against or sale of any real or personal property collateral or security, or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, after, or during the pendency of any arbitration or other proceeding.  The exercise of a remedy does not waive the right of either party to resort to arbitration or reference.   At Lender's option, foreclosure under a deed of trust or mortgage may be accomplished either by exercise of power of sale under the deed of trust or mortgage or by judicial foreclosure.

13.3.1    Potential Default Under RICO Related Law.  Notwithstanding anything to the contrary contained in this Agreement, if Lender has reasonable cause to believe that any material portion of the Project, any other collateral securing the Loan or any other funds, property or other assets of Borrower (collectively, the "Assets") might be subject to forfeiture under any RICO Related Law, Lender may, in its sole discretion, refuse to make any further Disbursements hereunder or under any of the Loan Documents, of any kind whatsoever, until Lender no longer has any reasonable belief that any portion of the Project or the Assets are subject to forfeiture under any RICO Related Law.

**14.    Intentionally deleted.**

15.    **ASSIGNMENTS/PARTICIPATIONS**.

The terms of this Agreement shall bind and benefit the heirs, legal representatives, successors and assigns of the parties; provided, however, that Borrower may not assign this Agreement or any Loan funds, or assign or delegate any of its rights or obligations, without the prior written consent of Lender in its sole discretion in each instance.   Lender in its sole discretion may sell or assign participations or other interests in all or part of the Loan and the Loan Documents, all without notice to or the consent of Borrower.  Also without notice to or the

36

consent of Borrower, Lender may disclose to any actual or prospective purchaser of any securities issued or to be issued by Lender, any participation interest or other interest in the Loan or any other loans made by Lender to Borrower (whether under this Agreement or otherwise), any financial or other information, data or material in Lender's possession relating to Borrower, the Loan, the Improvements or the Property.

16.    **LOAN FEE**.

Concurrently with the recording of the Deed of Trust and as a condition thereof, Borrower shall pay to Lender a non-refundable loan fee of One Hundred Fifty Two Thousand Seven Hundred Seventy Five Dollars ($152,775), which shall be deemed to have been earned in full upon the recording of the Deed of Trust.

17.    **PARTIAL RELEASES OF THE PROPERTY**.

17.1    **Release of Units Upon Seller Refinancing**.  In connection with the sale to independent third party purchasers or the refinancing by Lender of the Units upon which the Project is constructed, and subject to Paragraphs Error! Reference source not found. and 16.2 hereof, Lender shall cause such Units, to be released from the lien of the Deed of Trust upon the satisfaction, with respect to each such release, of all of the following conditions:

17.1.1    No Default.  There then exists no Event of Default or circumstance which, with notice or time or both, could become an Event of Default;

17.1.2    Request for Release.  Lender has received from Borrower a written request for such release, describing the Unit(s) to be released at that time;

17.1.3    Lawful Release.  The release of any such Unit(s) shall not (i) result in a disposition of the Property constituting a violation of any ordinance, law or regulation of any public authority relating to the subdivision of real property, or (ii) result in a violation of any ordinance, law or regulation of any public authority relating to the subdivision of real property as to any property released or any portion of the Property remaining subject to the Deed of Trust;

17.1.4    Access to Street and Utilities.  That portion of the Project which remains as security for the Loan continues to have adequate access to a public street or highway and to necessary public utilities and municipal services for its intended use; and

17.1.5    Set Aside Letter.  If Lender so requires, any Set Aside Letter pertaining to the Improvements or the Project has been released, or Lender's obligations under such Set Aside Letter have been reduced in scope, in any manner that Lender in its sole discretion may require, or Borrower has furnished satisfactory substitute collateral for Borrower's obligations to Lender in connection with such Set Aside letter.

17.1.6    Payment of Release Price.  Borrower has paid to Lender or has irrevocably instructed the escrow holder of the sales escrow relating to such Unit(s) to pay to Lender, concurrently with the closing of such escrow, cash or current funds, in an amount (the "Release

LoanAgrInc (REV 02/04/99)
109786.2

Price") equal to the greater of Net Sales Proceeds or 90% of the appraised value for each unit, as determined by an Appraisal dated _____ and all amendments or revisions thereto. For purposes of this Agreement, the term "Net Sales Proceeds" shall mean the total sales price for each Unit after deducting therefrom escrow closing costs, real estate broker commissions and title charges. Notwithstanding anything to the contrary contained herein, in the event Lender, in its sole and absolute discretion, releases any Unit from the lien of the Deed of Trust in consideration for which Lender receives less than the applicable Release Price, Lender shall have the option, exercisable in Lender's sole and absolute discretion, of increasing the applicable Release Prices for any or all of the Units then still encumbered by the lien of the Deed of Trust in amounts and in the manner deemed appropriate by Lender. Notwithstanding the foregoing, nothing contained herein shall obligate Lender at any time to accept less than the applicable Release Price for the release of any Unit from the lien of the Deed of Trust.

17.2    **Full Repayment of Loan.** Notwithstanding anything to the contrary contained in this Paragraph 16, upon the payment in full of all sums owing to Lender in connection with the Loan, Lender shall without additional consideration cause to be released from the lien of the Deed of Trust all portions of the Project not theretofore released, provided that there remain no monies to be disbursed to Borrower pursuant to the terms of this Agreement, (unless Borrower notifies Lender in writing that Borrower desires no further Disbursements of funds pursuant to this Agreement, in which event Lender's obligations under this Agreement to disburse such undisbursed funds shall automatically terminate). All sums received by Lender in connection with the release of the lien of the Deed of Trust from the Project shall be applied in reduction of the then outstanding principal balance of the Note and all accrued and unpaid interest thereon.

18.    **TITLE ENDORSEMENTS; TAX SEARCHES; ADMINISTRATIVE COSTS.** From time to time during the term of the Loan, Lender may, at Borrower's sole cost and expense, obtain or require Borrower to obtain, from such person or entity as Lender shall approve, in its sole and absolute discretion, such (i) title insurance endorsements to be attached to the Title Policy, in form and substance satisfactory to Lender, (ii) surveys of the Project, (iii) tax and insurance service contracts regarding the Project, and (iv) title searches, service contracts or other information regarding Borrower or the Project as Lender deems reasonably necessary. In connection therewith, Borrower shall be responsible for the payment of all costs incurred by Borrower or Lender in obtaining any of the foregoing including, without limitation, recording fees, attorneys' and accountants' fees, administrative costs and title and other insurance premiums.

19.    **MISCELLANEOUS.**

19.1    **Notices.** All written notices or demands of any kind that either party hereto may be required or may desire to serve on the other in connection with this Agreement shall be served (as an alternative to personal service) by registered or certified mail, recognized overnight courier service or facsimile transmission. Any such notice or demand so to be served by registered or certified mail, recognized overnight courier service or facsimile transmission shall be delivered with all applicable delivery charges thereon fully prepaid and, if the party so to be served be Borrower, addressed to Borrower as follows:

Twain Condominiums, LLC
630 Trade Center Drive
Las Vegas, Nevada 89119
Attention: Roni Amid
Fax No.: (702) 737-1033

and, if the party so to be served be Lender, addressed to Lender as follows:

**City National Bank**
400 North Roxbury Drive, RE 054
Beverly Hills, CA 90212
Attention: Michael Kazemzadeh
Fax No.: (310) 888-6488

with a copy thereof to:

**City National Bank**
400 N. Roxbury Drive
Beverly Hills, CA 90210
Attention: General Counsel
Fax No.: (310) 888-6232

Service of any such notice or demand so made by mail, recognized overnight courier or facsimile transmission shall be deemed complete on the date of actual delivery as shown by the addressee's registry or certification receipt or "answer back confirmation," as applicable, or at the expiration of the third business day after the date of dispatch, whichever is earlier in time. Either party hereto may from time to time, by notice in writing served upon the other as aforesaid, designate a different mailing address to which or a different person to whose attention all such notices or demands are thereafter to be addressed.

19.2    **Waivers.**  No delay or omission of Lender in exercising any right or power arising from any default by Borrower shall be construed as a waiver of such default or as an acquiescence therein, nor shall any single or partial exercise thereof preclude any further exercise thereof or the exercise of any other right or power arising from any default by Borrower. No waiver of any breach of any of the covenants or conditions of this Agreement shall be construed to be a waiver of or an acquiescence in or a consent to any previous or subsequent breach of the same or of any other condition or covenant.

19.3    **Attorneys' Fees.**  If any lawsuit or arbitration is commenced which arises out of or relates to this Agreement, the Loan Documents or the Loan, the prevailing party shall be entitled to recover from each other party such sums as the court or arbitrator may adjudge to be reasonable attorneys' fees (including Lender's in-house attorneys) in the action or arbitration, in addition to costs and expenses otherwise allowed by law. In all other situations, including any matter arising out of or relating to any Insolvency Proceeding (as defined in the Note), Borrower agrees to pay all of Lender's costs and expenses, including attorneys' fees, which may be

39

incurred in enforcing or protecting Lender's rights or interest. From the time(s) incurred until paid in full to Lender, all such sums shall bear interest at the Default Rate under the Note.

19.4    **No Third Party**. This Agreement is made for the sole benefit of Borrower and Lender and Lender's successors and assigns, and no other person or persons shall have any rights or remedies under or by reason of this Agreement or any right to the exercise of any right or power of Lender hereunder or arising from any default by Borrower, nor shall Lender owe any duty whatsoever to any claimant for labor performed or materials furnished in connection with the construction of the Improvements to apply any undisbursed portion of the Loan to the payment of any such claims.

19.5    **Tombstone Advertisements and Signs**. Upon the closing of the Loan, Lender shall have the right to place tombstone advertisements in any financial newspaper and newspaper of general circulation indicating that Lender is the Lender for the Improvements. So long as any sums shall remain due or owing to Lender under the Loan, Lender shall have the right to place a sign on the Project indicating that Lender is the Lender for the Improvements.

19.6    **Time of Essence; Context**. Time is hereby declared to be of the essence of this Agreement and of every part hereof. When the context and construction so require, all words used in the singular herein shall be deemed to have been used in the plural and the masculine shall include the feminine and the neuter and vice versa.

19.7    **Force Majeure**. If the work of construction is directly affected and delayed by fire, earthquake or other acts of God, strike, lockout, acts of public enemy, riot, insurrection, or governmental regulation of the sale or transportation of materials, supplies or labor, Borrower must notify Lender in writing within five calendar days after the event occurs which causes the delay. So long as no Event of Default has occurred and is continuing, Lender shall extend only those time periods stated in the Completion Schedule for completing construction that are directly affected and delayed by the event. Each such extension shall be for a period of time equal to the period of the delay, but not more than a total of sixty (60) days. Such an extension, however, shall not affect the time for performance of, or otherwise modify, any of Borrower's other obligations under the Loan Documents or the maturity of the Note.

19.8    **Governing Jurisdiction**. This Agreement and all of the other Loan Documents (except as otherwise expressly provided therein) shall be governed by and construed in accordance with the laws of the State of Nevada. Borrower consents to the jurisdiction and venue for any action arising out of the Loan Agreement in the state and federal courts of Los Angeles County, California.

19.9    **Entire Agreement**. This Agreement and all of the other Loan Documents constitute the entire understanding between the parties hereto with respect to the subject matter hereof, superseding all prior written or oral understandings, and may not be modified, amended or terminated except by a written agreement signed by each of the parties hereto or thereto. Notwithstanding the foregoing, the provisions of this Agreement are not intended to supersede the provisions of the Deed of Trust, but shall be construed as supplemental thereto. Borrower hereby acknowledges that this Agreement and the other Loan Documents accurately reflect the

40

agreements and understandings of the parties hereto with respect to the subject matter hereof and hereby waives any claims against Lender which Borrower may now have or may hereafter acquire to the effect that the actual agreements and understandings of the parties hereto with respect to the subject matter hereof may not be accurately set forth in this Agreement or such other Loan Documents.

19.10    **Headings**.  The various headings of this Agreement are included for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

19.11    **Severability**.  Each provision of this Agreement shall be interpreted so as to be effective and valid under applicable law, but if any such provision shall in any respect be ineffective or invalid under such law, such ineffectiveness or invalidity shall not affect the remainder of such provision or the remaining provisions of this Agreement.

19.12    **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same document.

19.13    **Additional Loan Documents**.  Concurrently with the recording of the Deed of Trust, and as a condition thereof, Borrower shall execute and deliver to Lender such other documents and instruments as Lender may require in order, among other things, to reflect Lender's security interests in the collateral securing the Loan.

19.14    **Waiver    of    Jury    Trial**.    BORROWER  HEREBY  KNOWINGLY, VOLUNTARILY  AND  INTENTIONALLY  WAIVES  ANY  RIGHT  THAT  BORROWER MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING IN ANY WAY IN CONNECTION  WITH  THIS  AGREEMENT  OR  ANY  OF  THE  OTHER  LOAN DOCUMENTS, OR ANY OTHER STATEMENTS OR ACTIONS OF LENDER. BORROWER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS AGREEMENT AND EACH SUCH OTHER LOAN DOCUMENT, AND THAT THIS WAIVER SHALL BE EFFECTIVE AS TO EACH OF THE OTHER LOAN DOCUMENTS AS IF FULLY INCORPORATED THEREIN.

20.    **ADDITIONAL PROVISIONS**.

20.1    **Release of Hard Cost Funds**.  No funds will be disbursed from the Hard Cost categories as detailed in Exhibit "B" and "C" attached hereto and made a part of hereof until Borrower provides Lender with (i) a formal written request approved by Lender; and (ii) Borrower's phasing plan for the Project, and the estimated sale prices and absorption for the Units acceptable to Lender.  Lender has the right to impose one or more additional conditions upon disbursements of funds from the Hard Cost categories upon receipt of the items described herein.

20.2    **Conditions to Reallocation of Hard Cost Contingency**.  Provided that Borrower shall have received and delivered to Lender within six (6) months of the closing of the Loan, evidence that (i) Borrower has obtained all required approvals, permits and exemptions required

LoanAgrInc  (REV 02/04/99)
109786.2

by Clark County, Nevada and the State of Nevada in connection with the conversion of the Project to a condominium development, including, without limitation, an exemption from the sale of subdivided land registration requirements under Nevada Revised Statutes ("NRS") Chapter 119, and (ii) complied fully and completely with the requirements set forth in NRS Chapter 116 regarding the conversion of rental units to condominium units, including, without limitation, the provisions of NRS 116.4106 and 116.4112, Lender will permit Borrower to reallocate an amount of the Hard Cost contingency category equal to One Hundred Thousand and 00/100 Dollars ($100,000.00) to the Soft Cost interest reserve for each ten (10) Units that are sold by Borrower to bona-fide third party purchasers either on an "As-Is" basis or in a refurbished condition if none of the costs of such refurbishment were funded with proceeds of the Loan. If Hard Costs are required for improvements to the Units, cash flow generated from the Project will be required to cover the monthly interest payments.

    20.3   **Unit Release upon Verification.**  Lender shall not release any Unit until verification is provided by Borrower, through signed purchase agreements, of thirty (30) sale units held in Bona fide sale escrows at the minimum appraised value for each Unit. Within twelve (12) months of the Deed of Trust recording Borrower must have obtained 100 Bona fide sale escrows of which 65 Units must have closed.

    **IN WITNESS WHEREOF**, the parties hereto have executed this Construction Loan Agreement as of the day and year first hereinabove written.

Borrower

Twain Condominiums, LLC,
a Nevada limited liability company

By:   _____
        Roni Amid, Manager


Lender

**City National Bank,**
a national banking association


By:   _____
        Bob Lucey, Assistant Vice President


By:   _____
        Michael Kazemzadeh, Senior Vice President

42

## EXHIBIT "A"
### LEGAL DESCRIPTION

ALL THAT LAND LYING WITHIN THE EXTERIOR BOUNDARIES OF FINAL MAP FOR TWAIN ESTATES A CONDOMINIUM COMMUNITY, AS SHOWN BY MAP THEREOF ON FILE IN BOOK 127 OF PLATS, PAGE 27, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

Borrower  Twain Condominiums, LLC
Loan No.  29869
Account No.  716133

## EXHIBIT "B"
## DISBURSEMENT SCHEDULE

No more than twice each month, as approved by Lender, following recordation of the Deed of Trust, Borrower shall submit to Lender a request for disbursement along with a written itemized statement ("Certificate for Progress Payment"), detailing the information and documents described in Paragraph 3.2.1 and 3.2.2 of the Agreement. The proceeds of the Loan, when qualified for disbursement as provided in Sections 3 and 20 of the Agreement, shall be deposited to Borrower's checking account #_____ held at Lender's Head Office, in the name of Borrower ("Loan Account") or otherwise disbursed to or for the benefit or account of Borrower, in a manner selected by Lender. A duplicate deposit slip will be mailed to Borrower at 4475 South Pecos Road, Las Vegas, Nevada 89121.

IT IS UNDERSTOOD AND AGREED THAT THE LENDER MAY AND WILL ACT IN RELIANCE UPON EACH REQUEST FOR DISBURSEMENT AND CERTIFICATION FOR PROGRESS PAYMENT SUBMITTED AS A REPRESENTATION AND WARRANTY ON BEHALF OF BORROWER AND BORROWER AGREES THAT IT MAY INCUR AS A RESULT OF ANY SUCH REPRESENTATION OR WARRANTY BECOMING UNTRUE.

IN ADDITION TO THE PROCEEDS OF THE LOAN IN THE AMOUNT OF $20,370,000.00, AS A CONDITION TO CLOSING THE LOAN AND RECORDING THE DEED OF TRUST, THE SUM OF THREE MILLION SEVEN HUNDRED TWENTY THOUSAND DOLLARS ($3,720,000.00) WILL BE CONTRIBUTED BY BORROWER TO ESCROW PRIOR TO CLOSE FOR THE ACQUISITION OF THE PROPERTY.

All of the terms and conditions contained herein shall be in addition to the terms and conditions set forth in the Agreement. The Loan shall be disbursed by Lender as follows, subject to transfers between line items as provided in the Agreement to which this Disbursement Schedule is an exhibit:

1001  **LAND.**    Prior to recordation of the Deed of Trust and satisfaction of the conditions in connection therewith, the sum of **$17,580,000.00**, which represents a portion of the costs to be incurred in connection with the acquisition of the Property, shall be wired to Nevada Title Company, to close Escrow/Title Order No. 04-06-0060-CLB, on behalf of Borrower.

1002.  **SOFT COSTS.** The sum of **$276,000.00** shall be disbursed by Lender to pay for the Soft Costs that are to be incurred by Borrower in connection with the construction of the Improvements in accordance with the provisions contained in Article 3 of this Agreement. Soft

Costs shall consist of the costs other than Hard Costs and Interest Reserve, as detailed in Exhibit "C" attached hereto and made a part hereof by this reference herein.

**2001. HARD COSTS.** The sum of **$1,664,000.00** shall be disbursed by Lender to pay for the Hard Costs that are to be incurred by Borrower in connection with the construction of the Improvements in accordance with the provisions contained in Sections 3 and 20 of the Agreement. Hard Costs shall consist of the direct cost of constructing the off-site and on-site improvements of the Project, other related improvements (*i.e.*, plumbing, lumber, electrical, drywall, framing, appliances, etc.), and consist of the costs set forth in more detail in the Cost Breakdown. The Improvements are to be completed in accordance with the Plans and Specifications, prepared by a licensed contractor or engineer and previously approved by Lender.

a. **Construction Hard Costs Category.** Upon verification by Bank's inspection of the Property and Improvements, Lender shall disburse 100% of each approved Certificate for Progress Payment for Hard Costs until such time as 90% or $1,497,600.00 has been disbursed. The total retention funds of 10% or $166,400.00 shall be disbursed to Borrower when: 1) the work is fully completed and has been accepted by Borrower; 2) a valid Notice of Completion has been recorded; 3) a Certificate of Occupancy or other satisfactory evidence of completion has been issued by the City of Las Vegas, County of Clark; 4) Nevada Title Company has issued to Lender an endorsement or a policy of title insurance with Mechanic's Liens coverage satisfactory to Lender; 5) the title company gives its written instructions to release funds (if any) retained pursuant to their Indemnity Agreement; 6) all time periods for filing stop notices have expired or stop notice rights have been waived to the satisfaction of Lender; and 7) there exists no stop notice against the construction fund which has not been released pursuant to Nevada law or in a manner otherwise satisfactory to Lender, or for which Lender does not hold funds (such conditions hereinafter referred to as the "Retention Disbursement Conditions"). In addition, notwithstanding anything to the contrary in the Loan Documents, upon satisfaction of the Retention Disbursement Conditions, Lender shall disburse the remaining undisbursed portion of the Loan.

**1800. INTEREST RESERVE.** The sum of **$850,000.00** shall be retained by Lender as a reserve for the payment of interest on the Loan, and Lender shall make disbursements from such reserve as such interest becomes due and payable thereon. If the Interest Reserve is insufficient or unavailable to pay accrued interest, Borrower agrees to pay all such amounts when they are due and payable. Lender is hereby authorized to charge Borrower's Funds Account directly for such interest payments as they become due. Bank shall provide Borrower with a monthly interest statement. Depletion of Interest Reserve shall not release Borrower from any of Borrower's obligations to pay interest accruing under the Note.

STOP NOTICES SHALL BE RESERVED AGAINST THE APPROPRIATE LINE ITEM AND RETENTIONS APPLICABLE THERETO TO THE EXTENT AVAILABLE AND, IF NOT, TO THE CONTINGENCY RESERVE TO THE EXTENT AVAILABLE. IF NEITHER THE LINE ITEM NOR THE CONTINGENCY RESERVE IS FULLY AVAILABLE, THE AMOUNT OF THE STOP NOTICES WHICH CANNOT BE RESERVED AGAINST THE LINE ITEM

OR CONTINGENCY RESERVE SHALL BE RESERVED AGAINST INTEREST
RESERVE.

Lender shall respond to duly requested beneficiary demands in the amount committed
hereunder and other amounts due under the Note and Deed of Trust irrespective of the actual
principal outstanding unless Borrower provides a payment bond in the amount provided for in
NRS Chapter 108 and a waiver of stop notice rights by the Contractor. Any funds held by
Lender in excess of amounts required to pay off interest and principal and other amounts due
under the Note and Deed of Trust shall be disbursed to Borrower when the conditions for
payment of retentions hereunder have been met, less any amount reserved pursuant to stop
notices. If the conditions for payment of retentions hereunder have been met, the Lender shall
respond to duly requested beneficiary demands in the amount of interest and principal owing,
plus any other amounts due under the Note and Deed of Trust but shall continue to hold amounts
held reserved pursuant to stop notices.

If any release price received by Lender pursuant to the release price agreement contained
in Paragraph 17 of the Agreement exceeds the then outstanding principal balance of the Loan,
the amount of the excess may, at Lender's option, be deposited in the Borrower's Funds Account
and thereafter be disbursed or applied by Lender in accordance with the Agreement. In no event
shall the Lender's Deed of Trust be reconveyed in full until all conditions for release of
retentions are met.


Borrower's Initials _____                    Lender's Initials _____


LoanAgrInc  (REV 02/04/99)
109786.2

## EXHIBIT "C"
## COST BREAKDOWN

| | TOTAL BUDGET | BORROWER'S EQUITY | CONSTRUCTION LOAN PROCEEDS |
|---|---|---|---|
| | | | |
| **LAND** | $21,300,000.00 | $3,720,000.00 | $17,580,000.00 |
| | | | |
| **HARD COSTS** | | | |
| Rehab Budget | $1,664,000.00 | $0.00 | $1,664,000.00 |
| | | | |
| **SOFT COSTS** | | | |
| Interest Reserve | $850,000.00 | $0.00 | $850,000.00 |
| Legal | $70,000.00 | $0.00 | $70,000.00 |
| CNB Loan Fee and closing costs | $206,000.00 | $0.00 | $206,000.00 |
| | | | |
| **Project Cost** | $24,090,000.00 | $3,720,000.00 | $20,370,000.00 |
| Unit Cost | $        94,843.00 | | |
| % Contribution | | 15% | 85% |

LoanAgrInc  (REV  02/04/99)
109786.2

EXHIBIT "D"

NOTE NO.:  29869            CUSTOMER NO.:  716133

MINIMUM RELEASE PRICE SCHEDULE

**To be determined at a later date.**

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |