1  RANDOLPH L. HOWARD, ESQ.
   Nevada Bar No. 006688
2  BART K. LARSEN, ESQ.
   Nevada Bar No. 008538
3  E. DANIEL KIDD, ESQ.
   Nevada Bar No. 010106
4  **KOLESAR & LEATHAM, CHTD.**
   3320 W. Sahara Avenue, Suite 380
5  Las Vegas, Nevada 89102
   Telephone: (702) 362-7800
6  Facsimile: (702) 362-9472
   E-Mail:   rhoward@klnevada.com
7            blarsen@klnevada.com
             dkidd@klnevada.com
8
   Attorneys for
9  **CITY NATIONAL BANK, N.A.**

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

\* \* \*

| In re: | Case No. 10-33323-lbr |
|---|---|
| TWAIN CONDOMINIUMS, LLC, | Chapter 11 Case |
| Debtor. | |

**CITY NATIONAL BANK, N.A.'S OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER PURSUANT TO BANKRUPTCY RULE 4001(b) AND LR 4001(b): (1) PRELIMINARILY DETERMINING EXTENT OF CASH COLLATERAL AND AUTHORIZING INTERIM USE OF CASH COLLATERAL BY DEBTOR; AND (2) SCHEDULING A FINAL HEARING TO DETERMINE EXTENT OF CASH COLLATERAL AND AUTHORIZING <u>USE OF CASH COLLATERAL BY DEBTOR</u>**

City National Bank, N.A. (the "<u>Bank</u>"), by and through its undersigned attorneys, hereby submits for the Court's consideration this Objection to Debtor's Emergency Motion for Entry of an Interim Order pursuant to Bankruptcy Rule 4001(b) and LR 4001(b): (1) Preliminarily Determining Extent of Cash Collateral and Authorizing Interim Use of Case Collateral by Debtor; and (2) Scheduling a Final Hearing to Determine Extend of Cash Collateral and Authorizing Use of Cash Collateral by Debtor (the "<u>Emergency Motion</u>").

This Objection is made and based upon the attached Points and Authorities, the

Declaration of Belynda Newman (the "Newman Declaration"), the Declaration of Lori J. Nelson (the "Nelson Declaration"), the Declaration of David Wright (the "Wright Declaration") and the Declaration of Bart K. Larsen, Esq. (the "Larsen Declaration) filed in support hereof and all Exhibits attached to said Declarations.

**POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Having filed its chapter 11 petition on the eve of the foreclosure sale of its only asset and sole source of income, Debtor Twain Condominiums, LLC ("Debtor") now seeks an emergency order determining the extent of the Bank's cash collateral as defined in Section 363(a) of the Bankruptcy Code[1] ("Cash Collateral") and authorizing Debtor's use Cash Collateral to fund ongoing operational expenses. The Bank gravely doubts Debtor's ability to successfully reorganize its financial affairs given the depressed and deteriorating state of the Southern Nevada real estate market and the severely impaired value of the Property[2], which by Debtor's own admission continues to fall.[3]

The most recent appraisal of the Property estimates its value to be only $6,860,000 as of October 4, 2010[4], which is *over $4,000,000 less* than the undisputed principal balance Debtor owes to the Bank. Consequently, the Bank is opposed to allowing Debtor to fund ongoing operating expenses using the rental proceeds from the Property in which the Bank holds a perfected, first-position security interest unless adequate measures are put in place to protect the value of the Bank's collateral. Any order allowing interim use of the Bank's Cash Collateral must be conditioned upon (i) the restriction of Debtor's operating expenditures to recent historic levels, (ii) Debtor's strict adherence to the previously agreed-upon monthly net operating income reporting requirements described herein, (iii) Debtor's continued monthly payment of all net

---

[1] 11 U.S.C. 101, *et seq.*

[2] Capitalized terms not defined herein shall have the same meanings as those ascribed to such terms in the Emergency Motion.

[3] *See* Larsen Declaration, Exhibit A, p. 73.

[4] *See* Nelson Declaration, Exhibit A.

operating proceeds to the Bank as previously agreed, and (iv) the implementation of additional measures as needed to provide adequate protection to the Bank to guard against the near certainty that the value the Property will continue to deteriorate as the Southern Nevada remains mired in the depths of the most severe economic recession since the Great Depression, which has already caused the value of the Property to fall by over 43% since December 2006.

The Bank further objects to the Emergency Motion to the extent that it seeks a determination that Debtor's cash and cash equivalents as of the Petition Date do not constitute Cash Collateral or that the Bank's security interest in Debtor's cash and cash equivalents was unperfected as of the Petition Date. Debtor's only known source of income is the rents received from the Property. Such rents constitute proceeds of the Property, which secures Debtor's indebtedness to the Bank. Accordingly, those proceeds must remain Cash Collateral.

Finally, the Bank expressly reserves all rights relating to Debtor's use of Cash Collateral, including the right to raise additional objections to the Debtor's request for the entry of a final order authorizing the use or determining the extent of Cash Collateral.

## II.    BACKGROUND

1.    Debtor entered into an 18-month Construction Loan Agreement (the "<u>Loan Agreement</u>"), Note (the "<u>Note</u>") and Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing (the "<u>Deed of Trust</u>") (collectively, the "<u>Loan</u>" or "<u>Loan Documents</u>") on or about April 27, 2006.[5]

2.    Under the Loan Documents, the Bank agreed to loan $20,370,000 to Debtor, which Debtor agreed to use to acquire and renovate the 254-unit Twain Estates apartment complex located at 3651 Arville Street, Las Vegas, Nevada 89103 (the "<u>Property</u>") with the intent to market and sell the individual units within the Property as condominiums. Debtor granted the Bank a first-position security interest in the Property and other assets of the Debtor as described in the Loan Documents.[6]

---

[5] Newman Declaration, ¶ 2. The Loan Agreement, Note and Deed of Trust are attached to the Newman Declaration as Exhibits A, B and C, respectively.

[6] *Id.*, ¶ 3.

3.      The Bank's security interest in the Property was perfected through the recording of the Deed of Trust in the office of the Clark County Recorder on April 28, 2006.[7] The Bank's security interest in Debtor's personal property was perfected through the filing of a UCC Financing Statement with the office of the Secretary of State of the State of Nevada.[8]

4.      Not long after Debtor began its ill-fated attempt to convert the Property to condominiums, the Southern Nevada real estate market collapsed as part of a larger national recession.

5.      When the Loan matured on November 1, 2007, Debtor had not completed the conversion of the Property to condominiums and was unable to repay the indebtedness owed to the Bank under the Loan Documents as originally agreed.[9]

6.      Debtor and the Bank subsequently entered into a series of agreements to amend the Loan Documents to, among other things, repeatedly extend the maturity date of the Loan.[10] Notwithstanding these extensions, Debtor ceased its efforts to market the Property as condominiums in or around September 2008 after selling just 62 of the 254 units. Since that time, Debtor has attempted to return the remaining 192 units to their original intended use as apartments.

7.      On or about March 25, 2009, the Bank and Debtor entered into a final agreement to amend the Loan Documents and to extend the maturity date of the Loan. This agreement was documented through a Loan Revision Agreement and an Amendment to Construction Loan Agreement, which extended the maturity date of the Loan through April 1, 2012.[11]

8.      In addition to extending the maturity date of the Loan, the March 25, 2009 Loan Revision Agreement reduced the principal balance due on the Loan to $11,404,234 and required Debtor to make a principal reduction payment in the amount of $450,000. As a result, the unpaid

---

[7] *Id*., Exhibit C.

[8] *Id*., ¶ 4; Exhibit T.

[9] *Id*., ¶ 5.

[10] *Id*., ¶ 6 – 14; Exhibits D – K.

[11] *Id*., ¶ 15; Exhibits L – M.

principal balance Debtor owed to the Bank was reduced to $10,954,234 as of March 25, 2009.[12]

9. The March 25, 2009 amendments to the Loan Documents also established various reporting and payment procedures that required Debtor to submit monthly reports to the Bank documenting its net operating income and to pay all net operating proceeds to the Bank to be applied to accrued interest and to reduce the indebtedness owed under the Loan Documents. Specifically, the March 25, 2009 Amendment to Construction Loan Agreement states:

> Section 10.9.4 is hereby deleted and replaced in its entirety to read as follows:
>
> "**Net Operating Income Reporting**. Within fifteen (15) days after the end of each month, commencing March 30, 2009, Borrower shall deliver to Lender statements of Net Operating Income (the "NOI") (as defined below) showing any excess funds over the monthly NOI, if any (the "Net Proceeds"). Net Proceeds shall be paid into CNB operating account no. 112-571566 within the earlier of: (i) five (5) days notice from CNB, or (ii) ten (10) days after the Net Operating Income reporting date. With such Net Proceeds applied to the Loan, and Note No. 170670-71319 provided in Paragraph 10.11. Borrower agrees no NOI distributions will be allowed to the Guarantor, Borrower's members, or any related parties of the Guarantor or Borrower's members. The first principal payment shall be due in May 1, 2009, and will include the previous months' reporting of Net Proceeds.
>
> "Net Operating Income" shall mean, for any relevant period, the Revenues minus the Expenses. "Revenues" shall mean any income associates with the Project including but not limited to income from the following: rents, vending machines, non-refundable deposits, deposit forfeitures, replacement charges, cleaning fees, late charges, NSF charges, HOA assessments and other miscellaneous items. "Expenses" shall mean all costs and expenses related to the Property based on the most recent appraisal in file. Operating Expenses from Management can not exceed 4.0% of total Revenues, and Operating Expenses for Salaries and Payroll can not exceed a combined total of $175,000 per year."[13]

10. Not withstanding the clear requirements set forth above that Debtor report its Net Operating Income and pay all Net Proceeds to the Bank on a monthly basis, Debtor has consistently failed to honor this agreement.[14] As a result, the Bank provided various notices of default to Debtor concerning these and other breaches of the Loan Documents on December 8, 2009, September 23, 2010 and November 8, 2010.[15]

---

[12] *Id*., ¶ 16.

[13] *Id*., ¶ 24, Exhibit M, § 2.

[14] *Id*., ¶ 25.

[15] Copies of the December 8, 2009, September 23, 2010 and November 8, 2010 notices of default are attached to the Newman Declaration as Exhibits R, Q and P, respectively.

11. Debtor's compliance with the reporting and payment requirements agreed to under the March 25, 2009 amendments to the Loan Documents has been inconsistent at best.[16] The most recent financial statement provided to the Bank by Debtor is dated October 11, 2010.[17]

12. The agreement to amend the Loan Documents in March 2009 also included the implementation of a remargining provision into the Loan Agreement to allow the Bank to protect its security interest in the Property as it was returned to use as apartments by requiring that Debtor maintain a maximum loan to value ("LTV") ratio of no more than 90% (the "Remargining Provision"). Specifically, the Amendment to Construction Loan Agreement set forth the following:

> Section 11 of the Loan Agreement is hereby amended and restated in its entirety to read as follows:
>
> "**APPRAISALS**. Borrower acknowledges CNB's right to obtain a new appraisal or update an existing appraisal of the Project at any time while the Loan or any portion thereof remains outstanding (i) when, in CNB's reasonable judgment, such an appraisal is warranted as a result of CNB's internal evaluation of the loan (at a minimum, a re-appraisal will be required twelve (12) months from the date of value cited in the original appraisal report), and/or (ii) to comply with statutes, rules, regulations or directives of governmental agencies having jurisdiction over CNB. Further, Borrower hereby agrees to pay, upon demand, all appraisers' fees and related expenses incurred by CNB from time to time in obtaining appraisal reports. If such new appraisal indicates that the ratio ("LTV Ratio") of the outstanding principal balance of the Loan plus any remaining undisbursed Loan funds to the then fair market value of the Property (as determined by such appraisal) exceeds 90% LTV Ratio or less, upon CNB's demand, Borrower shall pay to CNB, as a principal reduction of the Loan, such amount as is necessary to reduce the LTV Ratio to 90% or less. Notwithstanding the foregoing, if, as a result of any such reappraisal by CNB, CNB makes demand on Borrower to pay down the principal balance of the Loan so that the LTV Ratio will be 90% LTV Ratio or less and Borrower fails to do so, such failure shall constitute an Event of Default (as hereinafter defined) hereunder and CNB shall have the right to exercise all of its rights and remedies under the Loan Documents as a result of such Event of Default."[18]

13. As stated above, the Remargining Provision required that the Bank obtain a new appraisal of the Property within twelve (12) months of the date of the then-most-recent appraisal,

---

[16] Newman Declaration, ¶ 26.

[17] A copy of the October 11, 2010 financial statement is attached to the Newman Declaration as Exhibit S.

[18] *Id*., ¶ 17; Exhibit M, § 8.

1  which was dated December 24, 2008[19], for the purpose of re-evaluating the LTV ratio of the Loan.[20]

14. In accordance with the Loan Documents, the Bank obtained a new Summary Appraisal Report in December 2009[21] that estimated the market value of the Property at that time to be $10,200,000. This Summary Appraisal Report further established that the ratio of the outstanding principal loan balance ($10,954,234) to the fair market value of the Property ($10,200,000) to be approximately 107.4%, which far exceeded the maximum allowable LTV ratio of 90%.[22]

15. Based on the December 2009 valuation of the Property, the Bank demanded that Debtor tender a principal reduction payment in the amount of $1,774,234 in order to re-establish the maximum allowed LTV ratio of 90% or less. The Bank issued this remargining notice to Debtor on January 8, 2010 requiring tender of the principal reduction payment within 30 days.[23]

16. Debtor subsequently refused to pay any principal reduction payment. As a result, the Bank issued a notice of default to Debtor on February 9, 2010.[24]

17. Rather than comply with the remargining notice or attempt to cure its default, Debtor objected to the Bank's Summary Appraisal Report dated December 21, 2009 and subsequently obtained its own independent appraisal of the Property. Debtor's Narrative Appraisal, Summary Report[25] estimated the market value of the Property to be $11,750,000 as of March 3, 2010 and projected that the value of the Property would continue to decline at the rate of 2% per month during 2010.[26]

---

[19] A copy of the December 24, 2008 appraisal is attached to the Wright Declaration as Exhibit A.

[20] Newman Declaration, ¶ 18.

[21] A copy of the December 21, 2009 Summary Appraisal Report is attached to the Wright Declaration as Exhibit B.

[22] Newman Declaration, ¶ 19.

[23] *Id*., ¶ 20; Exhibit N.

[24] *Id*., ¶ 21; Exhibit O.

[25] A copy of Debtor's Narrative Appraisal, Summary Report dated March 3, 2010 is attached to the Larsen Declaration as Exhibit A.

[26] Larsen Declaration, Exhibit A, p. 73.

KOLESAR & LEATHAM, CHTD.
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Tel: (702) 362-7800 / Fax: (702) 362-9472

18. Even if Debtor's appraisal of the Property was accepted as accurate as of March 3, 2010, the ratio of the undisputed outstanding principal loan balance ($10,954,238) to Debtor's valuation ($11,750,000) still exceeded the maximum permitted LTV ratio of 90%. Thus, by Debtor's own admission, the Bank was entitled to a principal reduction payment of at least $379,234.08[27], which Debtor refused to pay.

19. The total amount of principal, accrued interest, late charges and penalties owed by Debtor to the Bank stood at $11,620,305 as of November 24, 2010.[28]

20. Given Debtor's persistent refusal to tender any principal reduction payment even as the value of the Property continued to fall, the Bank chose to exercise its rights under the Loan Documents to foreclose upon its security interest in the Property.

21. In furtherance of the Bank's efforts to foreclose, a trustee's sale of the Property was scheduled to take place on December 1, 2010 and later continued to December 16, 2010. Debtor filed its chapter 11 petition on December 15, 2010 just hours before the scheduled trustee's sale.

### III. LEGAL ARGUMENT

#### A. There Is No Dispute that Debtor's Post-Petition Apartment Rental Income Is Cash Collateral.

Cash Collateral "includes the proceeds, products, offspring, rents, or profits of property … as provided in section 552(b) of this title." 11 U.S.C. § 363(a). "Section 552(b) is an exception to bankruptcy's rule, found in Section 552(a), that after-acquired clauses in security agreements are not given effect in bankruptcy even though authorized by Article 9 of the UCC." *In re Las Vegas Monorail Co.*, 429 B.R. 317, 327 (Bankr. D. Nev. 2010). Section 552(b) states in part that:

[I]f the debtor and an entity entered into a security agreement before the commencement

---

[27] The LTV ratio as of March 3, 2010 using Debtor's appraisal is calculated as follows:

($10,954,234 Loan Balance) / ( $11,750,000 fair market value)  =  93.23%

A principal reduction payment in the amount of $379,234 would result in an LTV ratio of 90% if the fair market value of the property is deemed to be $11,750,000.

[28] Larsen Declaration, Exhibit A, ¶ 2.

Page 8 of 13

of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law …

11 U.S.C. § 552(b). "This exception allows lenders to follow their legitimate interest in transmuted forms of their collateral; a security interest in a receivable generated prepetition is not lost in bankruptcy simply because it was paid in cash after filing." *In re Las Vegas Monorail Co.*, 429 B.R. at 327. "Roughly speaking, this section parallels the similar protections under state law afforded by UCC § 9-315, protections which are automatically provided to every secured creditor without the need to request it." *Id*. (citation omitted).

Notwithstanding Debtor's request that the Court determine the extent of the Cash Collateral, Debtor concedes the foregoing and acknowledges that, pursuant to Section 552(b), the Bank "retains its security interest in the Debtor's cash proceeds that are identifiable and traceable directly from the Debtor's rental revenues generated after the Petition Date."[29] Accordingly, there appears to be no dispute that Debtor's post-petition rental income is Cash Collateral.

### B. The Bank's Security Interest in Debtor's Cash and Cash Equivalents, Which Are Traceable Proceeds of the Property, Was Perfected as of the Petition Date.

Citing NRS § 104.9312(2), Debtor incorrectly argues in the Emergency Motion that the Bank's security interest in Debtor's on-hand cash and cash equivalents remains unperfected due to the fact that such assets were not in the Bank's possession or control as of the Petition Date. While the statute cited by Debtor may require, in some circumstances, possession or control of deposit accounts and cash in order to perfect a security interest in such property, Debtor ignores the fact that most if not all of the cash and cash equivalents in Debtor's possession as of the Petition Date are traceable cash proceeds of the Property. As such, NRS § 104.9312(2) does not apply. Instead, the perfection of the Bank's security interest in such proceeds is governed by NRS § 104.9315, which provides in part:

---

[29] Emergency Motion, p. 3, ll. 6-8.

> 3. A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected.
>
> 4. A perfected security interest in proceeds becomes unperfected on the 21st day after the security interest attaches to the proceeds unless:
>
>> (a) The following conditions are satisfied:
>>> (1) A filed financing statement covers the original collateral;
>>> (2) The proceeds are collateral in which a security interest may be perfected by filing in the office in which the financing statement has been filed; and
>>> (3) The proceeds are not acquired with cash proceeds;
>>
>> (b) The proceeds are identifiable cash proceeds; or
>>
>> (c) The security interest in the proceeds is perfected when the security interest attaches to the proceeds or within 20 days thereafter.

NRS 104.9315 (3) and (4).

As explained in comment 7 to the corresponding § 9-315 of the Uniform Commercial Code, "if the security interest in the original collateral was perfected, a security interest in identifiable cash proceeds will remain perfected indefinitely, regardless of whether the security interest in the original collateral remains perfected." In this case, there should be no doubt that Debtor's security interest in the Property and the proceeds thereof was properly perfected through the recording of the Deed of Trust and the filing of the Bank's UCC Financing Statement. As such, the Bank's security interest in the cash proceeds of the Property was automatically perfected and remains perfected indefinitely.

Although Debtor has not yet filed any schedules or its statement of financial affairs, the only significant known source of revenue to Debtor is the rents and other income it derives from the Property.[30] Debtor has not provided any accounting or paid any portion of the November or December 2010 rents it collected to the Bank as required under the Loan Documents. As set forth in the October 2010 financial statement provided to the Bank, Debtor expected to collect rents totaling $237,782 in November and December 2010.[31] Moreover, Debtor's October

---

[30] *See* Declaration of Roni Amid [Docket No. 7] (the "Amid Declaration"), ¶ 19 ("Debtor's revenue is derived primarily from apartment rental income.").

[31] *See* Newman Declaration, Exhibit S.

financial statement projected Debtor's net operating proceeds for the months of November and December 2010 to total $110,537.[32] Debtor has paid no portion of its November or December net proceeds to the Bank. Yet, as of the Petition Date, Debtor claims to have had only $10,963 in cash on hand.[33]

Under the Loan Documents, Debtor is required to pay all net operating proceeds to the Bank to pay accrued interest and to reduce the indebtedness owed under the Loan Documents. Having failed to make such payments, Debtor should be required to immediately and fully account for its November and December 2010 rent income as a condition of any order allowing use of Cash Collateral for future operating expenses.

### C. Debtor Cannot Meet Its Burden of Demonstrating that Adequate Protection Exists.

A chapter 11 debtor's use of Cash Collateral is governed by Section 363 of the Bankruptcy Code. A debtor may not use cash collateral unless either "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease …" 11 U.S.C. § 363(c)(2). "Indeed, unless a debtor in possession obtains consent or a court order, it 'shall segregate and account for any cash collateral in the trustee's possession, custody, or control." *In re Las Vegas Monorail Co.*, 429 B.R. at 326 (citing 11 U.S.C. § 363(c)(4)).

To the extent that a debtor's use of Cash Collateral "results in a decrease in the value of [the secured creditor's] interest in such property," adequate protection must be provided in one of the forms identified in Section 361 of the Bankruptcy Code that "will result in the realization by [the secured party] of the indubitable equivalent of such entity's interest in such property." *Id*. (citing 11 U.S.C. §§ 361(1)(2) and 363(3)). "The general purpose of adequate protection is to ensure that the secured creditor ultimately receives what it would have had not bankruptcy intervened." *Id*.

---

[32] *See Id*. Also, Debtor's proposed budget projects monthly rental income of $110,000 and operating costs of $55,000 to $70,000, leaving projected net operating proceeds of $40,000 to $50,000 per month. *See* Amid Declaration, Exhibit 1.

[33] Amid Declaration, ¶ 20.

Debtor bears the burden of establishing that the Bank's security interest in the Cash Collateral is adequately protected. *See* 11 U.S.C. 363(p). Given the significantly impaired and declining value of the Property as evidenced by a series of three appraisals obtained by the Bank over the past 24 months, Debtor cannot meet this burden. There is absolutely no rational or factual basis for Debtor's assertion that the value of the Bank's collateral exceeds the indebtedness owed under the Loan Documents.[34] Debtor has provided no appraisal or other credible evidence to support its contention that the Bank's interest in the Cash Collateral is adequately protected. The Bank, on the other hand, has offered three own appraisals of the Property dated December 21, 2008, December 24, 2009 and October 11, 2010 that show the value of the Property declining by over 43% from $12,200,000 to less than $6,900,000 over the past 24 months, which equates to an average monthly decline of approximately 2.4% per month over this period.

Debtor's own appraisal of the Property dated March 3, 2010, which Debtor declined to offer in support of the Emergency Motion, estimated the value of the property to be $11,750,000 and projected that the value of the Property would continue to fall at the rate of 2% per month during 2010.[35] If Debtor's own appraisal and projections are accepted as accurate, the Property would currently be worth no more than $9,796,536[36], which is far less than the undisputed principal balance Debtor owes under the Loan Documents of $10,954,234. If the value of the Property continues to decline at the rate of 2% per month in the future, the Bank stands to lose well over $100,000 per month in collateral protection during each month that the trustee's sale of the Property is delayed.

Given the vastly under-secured status of the Loan, the continuing decline in the market value of the Property and the unexplained absence of the November and December 2010 rents collected by Debtor, which remain Cash Collateral, the Court should not enter any order

---

[34] *See* Amid Declaration, ¶ 25.

[35] *See* Larsen Declaration, Exhibit B, p. 73.

[36] A 2% per month decline in Debtor's $11,750,000 valuation of the Property from March 3, 2010 through December 3, 2010 would leave the current value at approximately $9,796,536. The decline over this nine-month period is calculated as follows: $11,750,000 \times (1 - .02)^9 = \$9,796,546$.

allowing Debtor to use Cash Collateral to fund future business operations unless the Bank's security interests are adequately protected. At a minimum, any order allowing use of cash collateral should be conditioned upon (i) the Debtor providing a full and accurate accounting of the November and December 2010 rent proceeds, (ii) the restriction of Debtor's future operating expenditures to recent historic levels as established pursuant to Debtor's previous financial reports to the Bank[37], (iii) Debtor's strict adherence to the monthly Net Operating Income reporting requirement implemented under the March 25, 2009 amendments to the Loan Documents[38], (iv) Debtor's continued monthly payment of all Net Proceeds to the Bank as previously agreed pursuant to the March 25, 2009 amendments to the Loan Documents and (v) the implementation of such additional measures as needed to provide adequate protection to the Bank.

## IV.    CONCLUSION

WHEREFORE, the Bank respectfully requests that any order allowing interim use of Cash Collateral by Debtor to fund ongoing operations be condition upon terms consistent with those set forth in this Objection.

DATED this 22nd day of December, 2010.

**KOLESAR & LEATHAM, CHTD.**

/s/ *Bart K. Larsen, Esq.*
RANDOLPH L. HOWARD, ESQ.
Nevada Bar No. 006688
BART K. LARSEN, ESQ.
Nevada Bar No. 008538
E. DANIEL KIDD, ESQ.
Nevada Bar No. 00010106
3320 W. Sahara Avenue, Suite 380
Las Vegas, Nevada 89102
Telephone: (702) 362-7800
Facsimile: (702) 362-9472
E-Mail:    rhoward@klnevada.com
           blarsen@klnevada.com
           dkidd@klnevada.com

Attorneys for
CITY NATIONAL BANK, N.A.

---

[37] *See* Newman Declaration, Exhibit S.

[38] *Id*., Exhibit M, § 2.